No. 83-338

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

IN RE THE MARRIAGE OF

RICHARD LAMBERT WAGNER,

Petitioner and Respondent,

and

PEARL F. WAGNER,

Respondent and Appellant.

APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Valley,
The Honorable Leonard H. Langen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

David L. Nielsen, Glasgow, Montana

For Respondent:

Gallagher, Archambeault & Knierim; Matthew W. Knierim,
Glasgow, Montana

Submitted on Briefs: December 8, 1983

Decided: March 13, 1984

Filed:

*Ethel M. Harrison*
—————————————————————
Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

This is an appeal from the final judgment entered in the District Court of the Seventeenth Judicial District, Valley County on February 18, 1983 distributing marital assets. No issue is taken with the granting of the decree of dissolution or the awarding custody of the one minor child to the petitioner. Appellant challenges only the disposition of the marital estate.

FACTS:

The parties were married on August 17, 1971. On December 17, 1980 the husband filed for dissolution of marriage. The trial court entered a temporary order on January 23, 1981, which ordered that the respondent, Pearl Wagner, be awarded temporary maintenance of $400 per month during the pendency of the action. Dissolution of the marriage was granted orally at a hearing on September 21, 1981 by the trial court sitting without a jury. The final decree of dissolution was entered on January 27, 1982. Shortly thereafter, husband petitioned the court claiming that he was not financially capable of continuing temporary maintenance payments to wife. On May 6, 1982, the trial court ordered the temporary maintenance terminated based on the husband's inability to provide. The final disposition of marital assets was entered on February 18, 1983.

Both husband and wife entered into the marriage with substantial personal assets. Prior to the marriage the husband owned real estate consisting of a 2280 acre ranch owned by the Wagner family for three generations with a 1971 appraised value of $236,000. Wife brought no real property into the marriage. Just prior to the marriage and shortly thereafter, wife sold certain cattle and contributed the proceeds of approximately $72,440 to the joint property of

2

the parties. During the course of the marriage, the parties accumulated considerable personal property and a small amount of real estate, which consisted of the "Scott Place," 640 acres, and "Porcupine" grazing rights. At the time of the final distribution of the marital estate the trial court found that no equity existed in the "Porcupine" grazing rights as the indebtedness equaled the value of the rights and furthermore, the grazing rights were forfeited due to husband's inability to pay the annual 1982 grazing fees. The Scott Place was purchased on a contract for deed in 1979 for $64,000. The only equity in real estate acquired after the divorce was the sum of two principal payments made in 1979 and 1980 on the "Scott Place" in the total amount of $25,600.

During the course of the nine year marriage while the parties lived together they were equal partners in the ranching operation. Both are and were competent, experienced and resourceful ranchers. Undisputed testimony reveals that the wife contributed to operating the ranch not only as a housewife, but also as an active worker in the fields and with the cattle. During the husband's illness in 1980 with cancer, the wife was responsible for even more ranch tasks previously shared with her husband.

Early in the marriage the parties began breeding "exotic cattle." The Wagners extended a large financial commitment to establish themselves in this market. However by 1974 the price and demand for "exotic cattle" dropped drastically and subsequently the entire cattle market fell. The diminution of cattle market values together with rising operating costs created personal financial difficulties for the parties.

The December 1981 separation was acrimonious and the husband and wife were unable to reach a mutually acceptable agreement on any issue. The trial court directed the parties to summarize their contentions regarding the division of

3

marital property in a pre-trial memorandum. Contentions of the parties varied widely on nearly every asset value. Since the husband and wife were unable to agree, the trial court on September 9, 1982, ordered a certified public accountant to serve as a Special Master of the proceedings, to assist the trial judge in defining the parties' contentions concerning the property. Originally, the CPA was ordered to prepare his Master's Report on the basis of the December 18, 1980, separation date. Early in October 1982 the parties agreed that the financial statements should reflect financial status at or near the time of trial so that the court would be aware of any changes in the parties' financial condition during the period from the separation, December 18, 1980 to the time of the trial. The final Master's Report included financial statements showing the net worth of the parties as of October 31, 1982.

The Master's Report indicated that the only area of agreement was the amount of the parties' liabilities. At the time of the marriage, husband had an indebtedness of about $5,000 on the family ranch. The wife entered the marriage with no debts. During the course of the marriage the parties accumulated a total indebtedness as of December 18, 1980 of approximately $672,000. The wife did most of the banking for the ranch. She was personally obligated on operating loans with Treasure State Bank for operating loans. However through negotiation and court orders the wife was no longer liable for any ranch obligations at the time of final disposition of the marital estate.

Upon the separation of the parties on December 18, 1980 the financial status of each party took divergent courses. The wife established herself in a new ranching operation without assistance from the husband other than monies previously awarded her by the trial court. At the time of

4

the separation, the wife retained her mineral interest which she inherited from her mother during the marriage and she also retained ownership of certain livestock from the marital estate. With this basis and loans from her family, the wife purchased several real properties, including the Gartside property for $50,000 and the Redd property for $41,000. At the time of the final disposition of marital assets the wife planned to acquire an additional 140 acres as evidenced by her earnest payment of $3,500. According to the trial court's findings at final distribution of assets the only indebtedness the wife had was the obligations she incurred in connection with establishing the new cattle operation.

The husband's financial status continued to deteriorate from separation to final disposition. A line of three operating loans held by Treasure State Bank of Glasgow, Montana were maintained for expenses to run the ranch. These loans accounted for $126,000 of the total $672,000 debt service encumbering the Wagner ranch. After numerous hearings and agreements negotiated by the parties, all of the livestock (except those cattle and horses retained by the wife) were sold early in 1981. The total amount received for the sale of these cattle was approximately $347,418. The husband applied a portion of these proceeds to reduction of $126,000 in operating loans. The husband did not raise any cattle or farm any crops during 1981 and 1982. While the husband was liquidating ranch livestock and ceasing all income-generating ranch operations he increased the operating loans. In January, 1981, the husband borrowed $16,775.27 as operating loan; in February of 1981, he borrowed an additional $70,756.93; and, in March, 1981, he borrowed $21,131.88. During March of 1981, the husband received reimbursement from the Agricultural Stabilization Conservation Service in an amount of nearly $17,000. These

5

funds were not applied against the operating loans held by Treasure State Bank. Additionally, the husband received a seismograph payment in the sum of $3,000 in the spring of 1981 which he did not use to reduce the operating loans. Sometime late in 1980 or early in 1981 the husband borrowed $8,000 against a life insurance policy owned by the husband which insured the life of the wife. None of this money was applied against the operating loans with Treasure State Bank. The husband made 1981 and 1982 annual installment payments on the "Scott Place" in the total amount of $25,600. In 1982 the husband's credit was "frozen" pending final distribution of marital property. Husband borrowed the 1982 payment on the "Scott Place" utilizing his brother's co-signature on a loan from Treasure State Bank. Husband's liabilities on October 31, 1982 were $641,000 making his net worth $171,000 as compared to his net worth of $313,724 at time of marriage.

The appellant makes the following challenges to the District Court's final disposition of marital assets on February 18, 1983:

1. The trial court erred by using the Master Report date of October 31, 1982 instead of the date of separation, December 18, 1980 for the date of valuation of assets and determination of parties net worth.

2. The trial court failed to equitably divide the marital assets.

3. The $800 per month in back separate maintenance temporarily ordered by the court on January 9, 1981 was improperly modified.

4. The findings of the trial court do not support the division of marital property.

The multiplicity of legal proceedings separated by extended periods of time develop an unusual set of facts. After consideration of the unique circumstances presented by

6

this case we find the challenge to the proper date of asset valuation to be dispositive.

A review of the record indicates that the District Court acted conscientiously to protect the marital estate and to equitably apportion it according to the rights of both parties. This was no easy task in the crossfire of divorce hostilities. In the findings of fact the trial court stated that the husband "is sometimes inclined toward exaggeration which results in what might be called unintentional misstatements of fact" and the wife "has the same propensity toward accuracy and preciseness in her testimony as does the petitioner." (Husband).

In this conflict the District Court found the following:

"(5)   That since the disputed issues of material facts which are set forth in the Masters Report can only be resolved by accepting the testimony of either the petitioner or the respondent the court finds that it will lead to injustice and error for the court to attempt to accurately determine the net worth of the parties and the net worth of the marital estate in dollars and cents and then through a process of mathematical computation to attempt to determine with preciseness each party's share of the marital estate.  Therefore the court accepts and adopts the Masters Report in its present form and will not attempt to resolve all of the issues of fact therein presented.

"(8)   The total net worth of petitioner and respondent when they entered into the marriage on August 17, 1971, was as follows:

       $313,724 - net worth of petitioner
       $118,303 - net worth of respondent

       $432,027 - total joint net worth of parties

"(18)   The court finds that from August 17, 1971, the date of the marriage until October 31, 1982, the net worth of the petitioner was reduced from $313,724 to $171,000 on October 31, 1982.  This was a reduction of 53.64%.

"The court finds that the net worth of respondent dropped from $118,303 on the date of the marriage to $59,600 on October 31, 1982, which was a drop of 50.37%.

"The joint net worth of the parties as of the date of their marriage was $432,027 and as of October 31, 1982, was reduced to $230,600, a reduction of 53.37%.

"(25) Because of the great variance in the contentions of each of the parties and for the reasons set forth in Findings of Fact No. 3, 4 and 5, the court is unable to make any precise Findings of Fact with reference to dollar amounts on mathematical computations regarding dollar amounts. However the court can find with reasonable certainty that the parties have already equitably divided the marital property and that it is fair and equitable that each party shall maintain and possess the property presently in his/her possession and each party shall be responsible for any indebtedness presently owing upon the property presently in his/her possession."

The primary issue regarding the proper date of evaluation of marital assets and net worth of the parties' has been specifically addressed by this court:

"A proper disposition of marital property in a dissolution proceeding requires a finding of the net worth of the parties at or near the time of the dissolution. Hamilton v. Hamilton (1980), _____ Mont. _____, 607 P.2d 102, 37 St.Rep. 247; Vivian v. Vivian (1978), _____ Mont. _____, 583 P.2d 1072, 35 St.Rep. 1359; Kramer v. Kramer (1978), 177 Mont. 61, 580 P.2d 439; Downs v. Downs (1976), 170 Mont. 150, 551 P.2d 1025. The basic reason for the rule is obvious; however, it is equally apparent that the application of the rule is dependent upon the kinds of marital assets under consideration. The time for proper valuation cannot be tied to any single event in the dissolution process. The filing of a petition, trial of the matter, or even the granting of the decree of dissolution do not control the proper point of evaluation by the District Court. (emphasis added)

"The exercise of discretion by the District Court is necessary when determining the worth of marital assets which fluctuate in value. For example, the value of a particular common stock may change drastically during the course of a dissolution while the value of the family home or other personal property remains stable. Under such circumstances selection of a single evaluation point for determining net worth of the parties could create an inequitable disposition." (emphasis added) Lippert v. Lippert (1981), _____ Mont. _____, 627 P.2d 1206, 38 St.Rep. 625, 628.

The instant case epitomizes this court's prior observation that: "Under such circumstances selection of a single evaluation point for determining net worth of the parties could create an inequitable disposition." The trial judge adhered to the rationale that "The time for proper valuation cannot be tied to any single event in the

8

dissolution process" and selected a valuation date of October 31, 1982, closer to the final disposition of the marital assets on February 18, 1983 than to the date of dissolution.

Section 40-4-202(1) provides guidelines for apportionment of marital property:

> "Division of property. (1) In a proceeding for dissolution of a marriage, legal separation, or division of property following a decree of dissolution of marriage or legal separation by a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to divide the property, the court, without regard to marital misconduct, shall, and in a proceeding for legal separation may, finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both."

The statute does not mandate a specific time period within which marital assets should be accounted for. The logical time period is the duration of the marriage. To include in the valuation of the marital estate any accumulation of financial wealth or, conversely, the increase in financial liabilities of either spouse subsequent to the termination of the "marital relationship" may effectuate an injustice and frustrate the intended purpose of division of martial property. Stated differently, to consider for distribution those assets acquired by one spouse after the martial relationship was terminated, might unjustly award a "windfall" to the dilatory spouse who did not work to accumulate those post-marital assets and penalize the diligent spouse for sound business judgment. The present case is an excellent example of such an inequitable outcome. Using October 31, 1982 as date of valuation of assets the District Court found:

> "However the court can find with reasonable certainty that the parties have already equitably divided the marital property and that it is fair and equitable that each party shall maintain and possess the property presently in his/her

possession and each party shall be responsible for any indebtedness presently owing upon the property presently in his/her possession."

The District Court erroneously determined that ". . . the parties have already equitably divided the marital property . . ."

The record is very clear regarding what property and funds each party received on December 18, 1980 when they separated and how each, independent of the other, decided to develop those marital assets. The wife left the family ranch with: (1) no debts; (2) a certain number of cattle and horses; and, (3) a mineral interest which she inherited from her mother during the marriage. At the same time, the husband retained ownership of the 2280 acre operative cattle ranch, complete with livestock, equipment and modern machinery. The husband remained responsible for the entire debt service on the ranch. Between the separation, December 18, 1980 and the date of dissolution, January 27, 1982 the wife, aggressively established herself in a new and completely different cattle operation. Admittedly, the wife had $400 per month from the husband in temporary maintenance payments, but the record reveals that a major portion of the capital necessary to fund her real estate purchases was generated on her own initiative through livestock sales, mineral lease payments, family and commercial loans. Between the separation and dissolution of marriage the husband: (1) terminated the ranch operation; (2) liquidated the livestock; and, (3) increased the operating loans encumbering the ranch. The wife did not participate, even as a decision maker, in the husband's increase in financial liabilities and the husband's only contribution of the wife's acquisition of real estate was the court-ordered temporary maintenance payments.

Based upon the unique facts of this case, neither the husband's increased financial obligation, nor the wife's real

10

estate and livestock purchases should legitimately be denominated "marital assets" for two reasons: (1) both were acquired after the marital relationship was irretrievably broken; and, more importantly, (2) the disparity of the parties' business acumen resulted in a change of either's financial status after the separation so that selection of the later date would create an unjust distribution.

This Court has generally accepted the date of formal legal dissolution of the marriage as the date terminating the marital relationship. The Court also recognizes that unique circumstances of marital relationships can modify this generally-accepted date of valuation of assets. The instant case presents a factual situation which merits deviating from the general rule. During the interim periods while the parties argued over their contentions concerning property division, the wife accumulated personal wealth and the husband increased operating loans against the ranch. When the court finally resolved the dispute over two years after the parties separated and the marital relationship was terminated, the financial status of each party had significantly changed due to their individual initiatives. Under the circumstances of this case the date of valuation of marital assets should have been the date of separation when, in fact, the marriage was irretrievably broken and individual business practices had not yet altered the financial status quo of the parties.

Taking all of the factors into consideration as mandated by 40-4-202 (1983), MCA, the trial court should have determined what portion of the marital estate was rightfully due the wife. It was within the authority of the District Court to deny the wife's request to sell the family ranch and pay the wife her portion of the marital assets in cash. However, in lieu of a sale of the ranch property, the

11

District Court may structure an alternative payment to achieve the intended equitable distribution of the marital estate between the husband and wife.

In summary, the District Court's selection of October 31, 1982 as date of valuation of marital assets effected an inequitable disposition of the marital estate. By using the October 1982 date of valuation, the District Court essentially rewarded the husband for encumbering the family ranch and penalized the wife for her ambitious effort after the broken marriage to negotiate her own independent financial security. Therefore, we find the District Court abused its discretion in failing to evaluate the marital assets as of the date of separation, which under these unusual circumstances, was the appropriate date of valuation.

The appellant's issues regarding inequitable division of marital property and the improper termination of temporary maintenance payments need not be addressed. The order of the District Court is vacated, and this cause remanded for further proceedings to determine an appropriate division of the marital estate as of the date of separation.

Justice

We concur:

Chief Justice

Justices

Mr. Justice L.C. Gulbrandson dissenting.

I respectfully dissent.

This Court recently stated in Holston v. Holston (Mont. 1983), 668 P.2d 1048, 1050, 40 St.Rep. 1435, 1436:

> "The standard for reviewing the property division in a dissolution decree is well settled in Montana. The apportionment made by the district court will not be disturbed on review <u>unless there has been a clear abuse of discretion as manifested by a substantially inequitable division of marital assets resulting in a substantial injustice.</u> (Citations omitted.) Abuse of discretion is further indicated by a trial court's arbitrary action without employment of conscientious judgment or in excess of the bounds of reason resulting in substantial injustice. (Citations omitted.)" (Emphasis added.)

At the pre-trial conference, both parties agreed that the special master should determine the financial condition of each party as of the date of final judgment. Obviously, such information was intended for consideration by the judge in evaluating the parties' respective abilities to pay or need for additional funds.

The trial judge's findings indicate that he considered all financial aspects of the ranching operation, tax considerations, the prior distributions of property to the wife, her improving financial situation, the health status of both parties and the husband's custody obligation of the son.

In my view, the trial judge did not commit a "clear abuse of discretion as manifested by a substantially inequitable division of marital assets resulting in a substantial injustice."

I would affirm the judgment of the trial court.

_____
Justice

-13-