No. 98-558

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 214

295 Mont. 511

985 P.2d 1176

---

MARLENE R. WILEY,

Petitioner and Appellant,

v.

SHERI L. IVERSON,

Personal Representative and Respondent.

---

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Patrick G. Frank, Gail M. Haviland, Worden, Thane & Haines, Missoula, Montana

For Respondent:

Jack Jenks, Phillips & Bohyer, Missoula, Montana

_____

Submitted on Briefs: January 28, 1999

Decided: September 14, 1999

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

1. ¶Marlene R. Wiley (Marlene) appeals from the Findings of Fact, Conclusions of Law & Order of the Fourth Judicial District Court, Missoula County, upholding the validity of an antenuptial agreement between Marlene and her deceased husband, Walter William Wiley (Bill). We affirm.

2. ¶The sole issue on appeal is whether the District Court properly determined that the antenuptial agreement was valid and enforceable.

### Factual and Procedural History

1. ¶On May 5, 1984, Bill and Marlene were married on the "spur of the moment." On May 4, 1984, one day prior to their marriage, Bill urged Marlene to execute a document entitled "Antenuptial Agreement" prepared by Bill's attorney. That agreement provided in relevant part:

1. Representations of Husband: Husband hereby represents that the items listed on Schedule "A," which is attached hereto, are all of the property and assets in which he has any interest whatsoever as of the date of execution of this Agreement.

. . . .

3. Release of Marital Rights: . . . . Wife hereby waives and releases all right and interest, statutory or otherwise, including, but not limited to, dower, widow's allowance, statutory allowance, distribution in intestacy, and right of election to take against the will of Husband which she might acquire as the wife, widow, heir at law, next of kin, or distributee of Husband, in his property, owned by him at the time of the marriage or acquired by him at any time thereafter, and in his estate upon his death.

4. Separate Property: Each of the parties shall have the absolute right to manage, dispose of, or otherwise deal with any property now separately owned, or hereafter separately acquired, in any manner whatsoever, and all the property brought into the marriage by each of the parties shall remain the sole property of the party who brought it into the

marriage.

1. ¶Bill's first wife died in March of 1984. Thereafter, Bill executed a will and a codicil to that will leaving everything in his estate in twelve equal shares to his four children, seven grandchildren, and Marlene. Bill died on August 21, 1997. He was survived by Marlene, his four daughters, and seven grandchildren. Upon Bill's death, Marlene received, due to joint tenancy ownership, a 1990 Lincoln Towncar and a 1997 Ford pickup. She also received numerous items of personal property and all of the assets and accounts of the "Touch of Life" nutritional and lifestyle consulting business, even though the estate held a one-half interest in that business. Marlene will receive a one-twelfth share of Bill's estate upon probate.

2. ¶In early 1998, Marlene, as Bill's surviving spouse, filed two petitions requesting supervised administration, a homestead allowance, an exempt property allowance, a family allowance, and an elective share of Bill's estate. The personal representative of Bill's estate, his daughter, Sheri L. Iverson (Sheri), responded to Marlene's petitions by asserting that the Antenuptial Agreement of May 4, 1984, constituted a valid waiver by Marlene of her rights.

3. ¶A hearing was held on the validity of the Antenuptial Agreement on July 16, 1998. At that hearing, Marlene's deposition was received into evidence and the court heard testimony from four witnesses on behalf of the estate. That evidence showed that Bill and Marlene first met at a clinic in Mesa, Arizona in 1978. Later, Marlene worked as a nutritional and lifestyle consultant for Bill at the Carefree Clinic in Carefree, Arizona, a business in which Bill held an interest. Prior to the marriage, Marlene had visited Sheri and the rest of Bill's family in Montana on several occasions, both by herself and with Bill.

4. ¶Marlene testified that she was aware of Bill's ownership interest in two nursing homes in Oregon, that she had visited those homes with Bill prior to their marriage, and that she knew that Bill's main source of income was from the two nursing homes. In addition, Marlene had knowledge of Bill's interests in the Carefree Clinic and a home in Arizona.

5. ¶Prior to the marriage, Marlene also knew that Bill was attempting to purchase a piece of real estate known as the "Lolo property." Bill's involvement with the Lolo property began in November of 1983, prior to his marriage to Marlene. At that time, the owners of the Lolo property were in bankruptcy and were purchasing the property on a contract for deed. Bill negotiated and financed a purchase of the sellers' interest in the contract for deed, completing the transaction on April 2, 1984, at which time the sellers assigned their interest in the contract for deed to Bill. Thus,

Bill held the sellers' interest in the Lolo property prior to his marriage to Marlene. However, due to the delay of bankruptcy proceedings, Bill did not complete his purchase of the Lolo property until May 8, 1985, when he purchased the buyers' interest in the contract for deed from their bankruptcy estate.

6. ¶Before his marriage to Marlene, Bill told Sheri that he desired an antenuptial agreement because "he wanted to keep everything separate, before and after the marriage." Bill's stated intention was that the Lolo property should pass to "his girls" upon his death. In April of 1984, Bill requested that his attorney in Montana prepare the Antenuptial Agreement. Bill told his attorney that both he and Marlene had been previously married and had children of their own, and that he wanted to keep his property separate from his marriage so that it would pass to his children.

7. ¶One day prior to their marriage, Bill presented Marlene with the Antenuptial Agreement while she was finalizing some paperwork at the Carefree Clinic, told her to sign it, and then left. Marlene filled in her name, address, and the date. Bill's and Marlene's signatures on the Antenuptial Agreement were notarized. Marlene acknowledged in her deposition that she signed the agreement voluntarily and that she was not pressured into signing it. Although Marlene admitted that she could have read the agreement, she stated that she did not read the agreement prior to signing it.

8. ¶Marlene further testified that she had observed that the document was captioned "Antenuptial Agreement," but did not understand what that meant. Nor did Marlene understand the legal significance of the agreement or consult an attorney about the legal consequences of signing the document. According to Marlene, Bill had told her that the agreement was necessary to protect him from the creditors of Marlene's daughter, who had declared bankruptcy. Except for Bill telling Marlene that the agreement was to protect him from creditors, Bill and Marlene never discussed the agreement or its legal consequences. Nor did Bill and Marlene discuss Bill's finances or assets at the time he presented the Antenuptial Agreement to Marlene. Apparently, the schedules showing Bill's assets were not attached to the Antenuptial Agreement at the time that Marlene signed that agreement. The first time that Marlene observed the schedules was after Bill's death.

9. ¶A close friend of the couple testified that after executing the agreement, Marlene had stated on at least ten occasions that, "if [Bill] died before she did, [Marlene] would get nothing." Although English is Marlene's second language, she speaks English, French, German, and some Spanish. She has traveled extensively throughout Australia, Switzerland, the United States, Canada, England, the Middle East, and India. Marlene holds a Bachelor of Science degree. She has also attended

college courses at Barry College in Florida, Duffy College in Australia, Brigham Young University in Utah, and the Utah Technical College. In 1962, Marlene passed the National Teacher's Examination in Fort Lauderdale, Florida. In 1976, she passed the English Proficiency Examination. Marlene has authored several books, including a remedial reading textbook published in 1978.

10. ¶Marlene had several years experience as a nurse, had some experience in business bookkeeping and management, and had previously owned a large maintenance company in Florida. She also had extensive teaching experience in various elementary schools, had been a principal for a private school in Orem, Utah, and had even worked as a substitute teacher at Brigham Young University.

11. ¶The District Court concluded that the parties voluntarily entered into the Antenuptial Agreement on May 4, 1984. Furthermore, the court concluded that the agreement was valid and, therefore, that Marlene had "released and waived her rights to a homestead allowance, exempt property allowance, family allowance and her right to petition for an elective share from Bill Wiley's estate." Marlene appeals.

## Discussion

1. ¶Did the District Court correctly conclude that Marlene waived her rights to Bill's estate by virtue of the Antenuptial Agreement?

2. ¶The question of whether there was fair disclosure of Bill's assets prior to execution of the Antenuptial Agreement by Marlene was a factual determination to be made in the first instance by the District Court. See In re Estate of Thies (1995), 273 Mont. 272, 279, 903 P.2d 186, 190. We review a district court's findings of fact regarding an antenuptial agreement to determine if they are clearly erroneous. Thies, 273 Mont. at 279, 903 P.2d at 190; see also Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287 (setting forth the three-part test for making a clearly erroneous determination). We review a district court's interpretation of the law as to whether it is correct. Scott v. Scott (1997), 283 Mont. 169, 173, 939 P.2d 998, 1000.

3. ¶Marlene raises several challenges to the District Court's order: (1) that the court applied the wrong standard of proof; (2) that the court erred in finding that there was fair disclosure; and (3) that the court erred in finding that she knowingly waived her rights and in finding her testimony that she did not know the value of the rights she waived to be not credible. We determine, as discussed below, that the District Court

applied the correct standard of proof to this dispute and properly found that there had been fair disclosure to Marlene resulting in a knowing waiver of her rights.

4. ¶We disagree with Marlene that the burden of proof is on the party seeking to enforce an antenuptial agreement. The statute in effect at the time the Antenuptial Agreement was entered into was § 72-2-102, MCA (1983), which provided:

**Waiver of Rights by Spouse.** The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property, and family allowance or any of them may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the party waiving after fair disclosure. Unless it provides to the contrary, a waiver of "all rights" (or equivalent language) in the property or estate of a present or prospective spouse or a complete property settlement entered into after or in anticipation of separation or divorce is a waiver of all rights to elective share, homestead allowance, exempt property, and family allowance by each spouse in the property of the other and a renunciation by each of all benefits which would otherwise pass to him [or her] from the other by intestate succession or by virtue of the provisions of any will executed before the waiver or property settlement.

Section 72-2-102, MCA (1983). The statute clearly imposes a requirement of "fair disclosure" as a precondition to the validity of a waiver in an antenuptial agreement, however, it is silent as to which party bears the burden of proving fair disclosure. We note in passing that § 72-2-102, MCA, was renumbered in 1993 as § 72-2-224, MCA, and amended to provide that the "surviving spouse" bears the burden of proving that the "waiver is not enforceable." See § 72-2-224(2), MCA (1999).

1. ¶Although this Court has not had occasion to expressly address the burden of proof under § 72-2-102, MCA, we implicitly suggested in the Thies decision that the surviving spouse should bear the burden of proof. In Thies, we reasoned that the Colorado Supreme Court's decision in In re Estate of Lopata (Colo. 1982), 641 P.2d 952, "represents the better interpretation of the language in § 72-2-102, MCA (1979)." Thies, 273 Mont. at 277, 903 P.2d at 189. In Lopata, the Colorado Supreme Court stated that:

It is well settled that once the proponent of an antenuptial agreement has established the existence of the agreement itself, the party contesting the validity of the antenuptial agreement has the burden of proving fraud, concealment or failure to disclose material

information.

<u>Lopata</u>, 641 P.2d at 955; <u>see also</u> <u>Lopata</u>, 641 P.2d at 955 n.7 (citing cases from other jurisdictions in accord with this rule). Here, there is no question that Sheri has established the existence of the Antenuptial Agreement.

1. ¶More importantly, placing the burden on the surviving spouse to prove an invalid waiver is consistent, as Sheri suggests, with § 26-1-401, MCA. That statute provides:

The initial burden of producing evidence as to a particular fact is on the party who would be defeated if no evidence were given on either side. Thereafter, the burden of producing evidence is on the party who would suffer a finding against him [or her] in the absence of further evidence.

Section 26-1-401, MCA; <u>see also</u> § 26-1-402, MCA (generally parties bear the burden of persuasion as to each fact the existence or nonexistence of which is essential to the claim for relief or defense asserted). Under § 26-1-401, MCA, the party asserting a right in any case bears the burden of proving each of the material allegations of his or her cause of action. <u>See</u> McDonald v. Peters (1954), 128 Mont. 241, 243, 272 P.2d 730, 731. Generally speaking, an antenuptial agreement is valid and enforceable between two consenting parties in Montana if the agreement meets the requirements of a contract. <u>See</u> In re Marriage of Feisthamel (1987), 227 Mont. 321, 325-26, 739 P.2d 474, 477.

1. ¶"Thus, antenuptial agreements receive the same scrutiny as any other contract except that there is the additional requirement of fair disclosure imposed upon both parties in recognition of the confidential relationship existing between them." <u>Lopata</u>, 641 P.2d at 956. Marlene, as the petitioner seeking relief from the Antenuptial Agreement, bears the burden of proving that the contractual waiver is invalid. We hold that the surviving spouse bears the burden of proof on the absence of fair disclosure under § 72-2-102, MCA (1983).
2. ¶In interpreting the requirement of fair disclosure pursuant to § 72-2-102, MCA, we have observed that:

"Fair disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other. <u>Each party has a duty to</u>

consider and evaluate the information received before signing an agreement since they are not assumed to have lost their judgmental faculties because of their pending marriage." [Emphasis added.]

Thies, 273 Mont. at 278, 903 P.2d at 190 (quoting Lopata, 641 P.2d at 955).

1. ¶The duty to inquire prior to signing an antenuptial contract is consistent with the general rule in Montana that:

One who executes a written contract is presumed to know the contents of the contract and to assent to those specified terms, in the absence of fraud, misrepresentation, or other wrongful act by the other contracting party. Absent incapacity to contract, ignorance of the contents of a written contract is not a ground for relief from liability.

Quinn v. Briggs (1977), 172 Mont. 468, 476, 565 P.2d 297, 301.

1. ¶There is no allegation by Marlene that the Antenuptial Agreement is ambiguous. It is undisputed that Marlene signed the Antenuptial Agreement, in which she acknowledged, in writing, that Bill had "disclosed to [her] the nature and extent of his various property interests and of his sources of income." Marlene admitted that she voluntarily signed the Antenuptial Agreement that was presented to her by Bill. There is simply nothing in the record to indicate that she was coerced into signing the Antenuptial Agreement, that she requested more time to consider and study the agreement, or that she was precluded from retaining independent counsel to review the agreement and advise her as to the legal consequences of signing it. See Thies, 273 Mont. at 280, 903 P.2d at 191.
2. ¶Although Marlene claims that she did not understand the agreement, we agree with the District Court that her self-serving testimony is not credible given the strong evidence that she was a relatively experienced businesswoman, was well educated, had more than a cursory understanding of the English language, and could have read the Antenuptial Agreement but declined to do so. Were we to accept Marlene's contentions and hold that she should be excused from the Antenuptial Agreement because she did not read and understand its terms, we would place all antenuptial agreements on flimsy ground and thereby undermine the freedom of prospective

spouses to contract with each other. "The integrity of written contracts would be destroyed if contracting parties, having admitted signing the instrument, were allowed to rescind the contract on the basis they neither read nor understood the expressed agreement." <u>Quinn</u>, 172 Mont. at 476, 565 P.2d at 301.

3. ¶Moreover, we also agree with the District Court that even assuming that Marlene did not observe the schedules of Bill's assets at the time of signing the Antenuptial Agreement, she had sufficient general knowledge of his assets and sources of income to support a finding of fair disclosure. Marlene and Bill had worked together for years before deciding to marry and Marlene was close with Bill's family even prior to the marriage. It is clear from the record that Marlene knew of Bill's interests in the two nursing homes in Oregon and in the Carefree Clinic and home in Arizona. Marlene was also aware of the fact that Bill was in the process of acquiring the Lolo property at the time of marriage.

4. ¶In actions in equity, "this Court will accept the findings of the District Court unless there is a 'decided preponderance of the evidence against them,' and . . . where issues of fact are close, we defer to the District Court because it is in a better position to determine the facts." Johnson v. Estate of Shelton (1988), 232 Mont. 85, 88, 754 P.2d 828, 830 (quoting Peterson v. Taylor (1987), 226 Mont. 400, 403, 735 P.2d 1120, 1122). We hold that the District Court's findings of fact on the question of fair disclosure are not clearly erroneous: the findings are supported by substantial credible evidence, and the court neither misapprehended the effect of that evidence nor committed a mistake warranting reversal. <u>DeSaye</u>, 250 Mont. at 323, 820 P.2d at 1287. Therefore, we hold that the court correctly concluded that Marlene waived her rights to Bill's estate by virtue of the Antenuptial Agreement.

5. ¶In conclusion, the District Court did not err in determining that the Antenuptial Agreement between Marlene and Bill was valid, thus precluding Marlene from collecting a homestead allowance, an exempt property allowance, a family allowance, or an elective share from Bill's estate.

6. ¶Affirmed.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART