No. 99-093

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 132

299 Mont. 527

1 P. 3d 364

IN RE MARRIAGE OF POSPISIL,

GEORGE K. POSPISIL,

Petitioner and Respondent

and

JOYCE M. POSPISIL,

Respondent and Appellant

APPEAL FROM: District Court of the Tenth Judicial District,

In and for the County of Fergus,

The Honorable David Cybulski, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Gary S. Deschenes, Randy L. Tarum, Deschenes Law Office, Great Falls, Montana

For Respondent:

Carl DeBelly, Lewistown, Montana

Submitted on Briefs: August 5, 1999

Decided: May 23, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Joyce M. Pospisil (Joyce) appeals two orders issued by the Tenth Judicial District Court, Fergus County. Joyce first contends that a Scheduling Order, issued January 12, 1999, which set a hearing date for January 25, 1999, violated her due process rights. Second, she contends that the court's January 26, 1999 Order Implementing Property Division did not achieve an equitable division of marital assets in accordance with the Findings of Fact and Conclusions of Law, and the Final Decree and Judgment, entered by the same court on June 11, 1996, and June 20, 1996, respectively.

¶2 We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶3 Joyce raises the following issues on appeal:

1. Did the District Court deny Joyce Pospisil due process by scheduling a hearing date on fourteen-days notice?

2. Did the District Court err by failing to make an equitable division of the marital estate?

## Factual and Procedural Background

¶4 The parties were married on October 11, 1979, and separated in March of 1994. At the time of their marriage, Joyce was 45 years old, and George Pospisil (George) was 46 years old. They both have children from prior marriages, but none from their marriage to each

other. While married, Joyce and George operated, and for a while lived on, a ranch and farm located in Fergus County, Montana.

¶5 The separation was not amicable. After more than two years of contentious litigation a final dissolution decree was entered by the District Court on June 20, 1996. Although Joyce entered the marriage with little property of her own, she was awarded $305,855 as her net share of the marital estate. Notwithstanding the fact that George did not directly appeal this judgment, Joyce's days of wrangling with her former spouse were far from over.

¶6 The primary source of contention between the parties--then and now--is property, namely the 1,400 acre farm and ranching operation near Moore, Montana. Prior to his marriage to Joyce, George was gifted 160 acres from his parents, and an undivided fifteen-percent interest in 1281 acres. In 1982, his parents entered a contract for deed with George, selling him the remaining eighty-five percent interest for $221,638. During their marriage, however, George and Joyce did not make any payments on the contract for deed. George's parents and then his mother (his father died in 1984), not once demanded payment or gave any notice of default while George and Joyce were married. Further, George and Joyce treated the property as their own by paying taxes, paying related insurance premiums, using it as security on numerous occasions, and placing the entire property on the market for sale several times.

¶7 The cloudy legal status of the contract for deed would prove to be stormy. In the midst of the dissolution proceedings, George's mother, Ruby Pospisil (Ruby), filed a quiet title complaint against George and Joyce on March 14, 1995. This action sought to invalidate the contract for deed, and thereby remove a majority of the marital property from the dissolution. At this same time, George had, in fact, assumed power of attorney over his mother's affairs as of January 11, 1994. Ruby, who was age 94 at the time, resided in a Lewistown nursing home.

¶8 Ultimately, the quiet title action would be joined with the dissolution proceedings, by an order issued May 15, 1995. In an order dated June 12, 1995, the court noted that "the belated quiet title action by his mother is highly suspect." In its Findings of Fact and Conclusions of Law, the court stated that "Ruby's belated quiet title action was and is a conspiratorial sham between son and mother to deplete the marital estate to the wife's detriment after a marriage of 17 years." The court dismissed the quiet title action in its June 20, 1996 decree. On August 12, 1996, Ruby appealed the dismissal of her quiet title

action, which prevented Joyce from conducting a sale of the marital property as ordered by the District Court. This Court affirmed the District Court's dismissal of the quiet title action in May of 1997.

¶9 Within months, counsel for Ruby would pursue further legal action. On June 26, 1997, Ruby declared the contract for deed in default, and requested it be cured within 60 days. She requested that a total sum of $1,779,012.12 be paid in full. This sum represented the $221,638 purchase price, $449,189 in accrued interest, $1,008,185 in crops and proceeds, and an additional $100,000 for 1997 crops and proceeds. The court issued an order on January 30, 1998, denying Ruby's motion to intervene. Ruby filed a request for declaratory judgment in September 1998.

¶10 Not only did the District Court find that Ruby's quiet title action was a "sham" in its 1996 decree, it also determined that Joyce was entitled to a fifty-percent share of the property's value, even if it meant selling the operation to achieve such an equitable result. The court determined that throughout much of their marriage, Joyce managed the affairs of the ranch and farm, essentially "keeping the business afloat," while George pursued investment opportunities elsewhere, including several ranch and timber ventures in Oregon. According to the court's findings, these ventures were less than financially successful. Additionally, the record indicates that George on more than one occasion considered selling his family's Fergus County property himself, but stopped short when faced with the prospect that Joyce might share in the proceeds.

¶11 The court also found that as a result of one of these Oregon deals going sour in 1988, George quitclaimed his entire interest in all of the ranch properties to Joyce, and assigned to her his ownership interest in the livestock brands and ranch accounts. It is undisputed that he took this action in order to protect their ranch from a possible unfavorable judgment in the event a lawsuit was filed. George contended that the transfer was one of "trust," in that he could, upon request, have the property reconveyed to him. Once the parties separated, Joyce refused to reconvey the property to George. These circumstances would eventually lead to further confusion following the entry of the dissolution decree, as George took over "exclusive possession" of the farm and ranch, pursuant to the decree, while financial obligations concerning the ranch were directed to Joyce, who resided in Lewistown.

¶12 Following the entry of the decree and prior to this appeal, a considerable volume of legal maneuvers consumed the intervening years in addition to Ruby's appeal. For

example, Joyce moved the court for temporary maintenance. On January 14, 1997, the District Court ordered that Joyce be awarded maintenance, retroactive to June 14, 1996, in the amount of $1,500 per month. George failed to comply with this order, forcing Joyce to engage in regular executions on George's assets. In May of 1998, Judge Davis recused himself from the case, and Judge David Cybulski was substituted. Most recently, with a potential sale of marital property and a final resolution of the dissolution looming, the parties disputed what marital assets had or had not been distributed since 1996, and who had paid what farm and ranch obligations. On August 28, 1998, Joyce claimed that the outstanding distribution owed to her was $341,477--which accounted for appreciation of the marital assets--and that George still owed her an additional $16,500 in maintenance. According to George's August 31, 1998 accounting, however, Joyce had received $190,888 in distributions from the marital estate. This ongoing dispute led to a January 25, 1999 dispositional hearing.

¶13 On January 12, 1999, the court issued its scheduling order, which identified the issues that would be addressed by the parties at the hearing. Essentially, the court identified those issues that remained in dispute, which the parties--including Ruby--had spent the prior six months contesting in an exchange of replies and responses to each other's statements of accounting filed with the court.

¶14 Joyce objected to the hearing date on January 20, 1999, claiming that the time between the January 12th order and the January 25th hearing was insufficient to conduct discovery necessary to fully prepare for the issues identified by the court's order. She did not file a brief addressing seven issues identified by the court's scheduling order. George, on the other hand, filed a brief in response to the requests on January 22, 1999.

¶15 Nevertheless, the fact-finding hearing took place as scheduled. The court determined that as far as resolving the dispute over the marital assets, each party had "contributed to the mess" and both parties "share equal responsibility in frustrating the exchange of information between the sides."

¶16 The next day, the District Court issued an Order Implementing Property Division. The District Court reduced Joyce's 1996 $305,855 net share to $141,660, plus $20,687 owed in unpaid maintenance. First, based on the mutual concessions of the parties, the court determined that a total of $8,603, should be deducted from Joyce's share. The court then deducted $135,020 in assets that Joyce had allegedly received, including $23,721 from "Livestock and sales," a vehicle worth $10,378, $33,221 from a ranch bank account,

$59,000 from another bank account in Joyce's name, and $8,700 from full payment of a promissory note. The court then added a total of $23,709 for obligations that Joyce had paid, including $5,340 for a vehicle that had been awarded to George, $5,357 for property taxes on the ranch, and $13,012 for an insurance policy that covered the ranch property. Finally, the court deducted $44,281, which it determined Joyce owed George's mother in interest under a contract for deed. Based on the foregoing findings, the court determined that Joyce's share of the marital estate was $141,660. The court determined that thirteen back-maintenance payments, or $19,500, plus interest were due for an additional $20,687.

¶17 On January 29, 1999, Joyce filed an objection to the court's order pertaining to ASCS (Agricultural Stabilization and Conservation Service) payments and requested a hearing. The court granted this request by order on February 1, 1999. A hearing took place on February 8, 1999. Joyce filed her notice of appeal that same day.

## Standard of Review

¶18 Joyce has argued that the District Court, in issuing a scheduling order within two weeks of a hearing, and then denying what must be construed as a motion to continue, abridged her constitutional right to due process. Consequently, she suffered detriment in that she was deprived of marital property once the court reduced the amount of her marital estate distribution following the hearing. Our review of questions involving constitutional law is plenary. *See State v. Schnittgen* (1996), 277 Mont. 291, 295, 922 P.2d 500, 503. Further, we will review a district court's decision to grant or deny a motion for a continuance for abuse of discretion. Any motion for a continuance is within the sound discretion of the district court and we will not overrule the court's decision to deny Joyce's request for a continuance unless there is an affirmative showing that she has suffered prejudice. *See In re Marriage of Caras* (1994), 263 Mont. 377, 383, 868 P.2d 615, 618 (citations and internal quotations omitted).

¶19 We review the division of marital property by a district court to determine whether the findings upon which the district court relied are clearly erroneous. *In re Marriage of Engen*, 1998 MT 153, ¶ 26, 289 Mont. 299, ¶ 26, 961 P.2d 738, ¶ 26. "If the findings are not clearly erroneous, we will affirm the distribution of property unless the district court abused its discretion." *Engen*, ¶ 26 (citations omitted). The test for abuse of discretion in a dissolution proceeding is "whether the district court acted arbitrarily without employment of conscientious judgment" or whether the district court "exceeded the bounds of reason resulting in substantial injustice." *Engen*, ¶ 26 (citation omitted).

¶20 Finally, the standard of review of a district court's conclusions of law is whether the conclusions are correct. *See Scott v. Scott* (1997), 283 Mont. 169, 173, 939 P.2d 998, 1000 (citations omitted).

## DISCUSSION

¶21 First, and foremost, we must make clear that the original, 1996 dissolution decree in this matter is not at issue. As Joyce concedes in her briefs, the time to appeal such matters has long since passed. The District Court, in its 1999 Order Implementing Property Division, stated that "[t]he Court will not relitigate those matters previously set forth in the Decree Of Dissolution of Marriage, and the Court finds the Decree to be in full force and effect." We agree, and accordingly use this pronouncement as a starting point in determining whether the District Court relied on erroneous findings or abused its discretion in determining what assets had or had not been distributed, and what assets and liabilities remained, subsequent to the entry of the 1996 decree. Thus, we begin with the District Court's 1996 determination that Joyce was entitled to a fixed judgment of $305,855 under its decree, and proceed in our review of the various adjustments determined by the District Court.

## *Issue 1*

*Did the District Court deny Joyce Pospisil due process by scheduling a hearing date on fourteen-days notice?*

¶22 The alleged deficient notice in question is found in the District Court's January 12, 1999 scheduling order which, in part, provides that each party "can present evidence on what has happened with these assets since the date of [the 1996] decree and make a determination of the debt associated with that property and address the issues identified." This instruction follows a list of 16 items valued and assigned under the 1996 dissolution decree. The order further required that each party brief seven separate issues prior to the hearing.

¶23 Joyce argues that the District Court did not provide her sufficient notice of the issues that would be addressed at the January 25, 1999 hearing, and that consequently she was denied the opportunity to conduct meaningful discovery and adequately present her case to the court. She contends that as a result of this short notice and the court's refusal to reschedule the hearing, she was denied due process under Montana's Constitution, Article

II, Section 17.

¶24 George counters that the subject matter of the hearing in January, as outlined in the scheduling order, was the culmination of several prior hearings and conferences directed at the ongoing dispute between the parties. The issues identified in the scheduling order, therefore, have existed since the dissolution decree was entered in 1996. At the commencement of the January hearing, the court agreed with George's assessment, and refused to delay the adjudication of this matter any further. The court noted that this dispute commenced in 1994 with a filing for dissolution, and that a decree was entered in 1996. Judge Cybulski informed the parties that "if you guys haven't got it figured out . . . by the time four years have passed . . . . it's hopeless anyway."

¶25 Article II, Section 17, of the Montana Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." In the context of this dispute, this Court has stated that due process of law refers to those fundamental rights which "our system of jurisprudence has always recognized, that is, of requiring notice to be given and a hearing had before property may be taken . . ." *In re Marriage of Nordberg* (1995), 271 Mont. 328, 331, 896 P.2d 447, 449 (citation omitted). We agree that the District Court's January 26, 1999 order, which effectively reduced Joyce's share of the marital estate, entitled her to notice and a hearing. We disagree, however, that the notice in this instance was insufficient.

¶26 The defective notice in *Nordberg* instructed the parties that a "Court-counsel conference" via telephone would be held that addressed "the format for the disposition of all pending [matters] in this cause." *Nordberg*, 271 Mont. at 330, 896 P.2d at 448. During the conference call, the court requested that one party submit her calculation of the amount still due under a prior dissolution decree. The party complied. Shortly after the conference call, she submitted a copy of the calculation to the court and opposing counsel. Without holding any further proceedings, the court granted her a money judgment. *See Nordberg*, 271 Mont. at 331, 896 P.2d at 448-49.

¶27 On appeal, this Court concluded that the principles of due process required that the husband should "be given notice and an opportunity to present evidence of his payments toward the 1987 judgment before a new judgment was entered against him." *Nordberg*, 271 Mont. at 332, 896 P.2d at 449.

¶28 Our decision in *Nordberg* is analogous to the case *sub judice*. At the January 25, 1999

dispositional hearing, the court accepted evidence of payment and distribution pursuant to a prior decree, and then arrived at a new judgment, re-establishing the rights of the respective parties. Thus, if Joyce can show that she was not afforded the opportunity to adequately present evidence, similar to the husband in *Nordberg*, then a new hearing would be a necessary remedy for such a due process violation.

¶29 Contrary to Joyce's argument, however, the District Court's January 12, 1999 scheduling order did not exactly break virgin ground. The order did nothing more than restate the contents of an earlier order issued on October 14, 1998. In that order, which was preliminary to the parties' November 5, 1998 conference, the court required that each party establish the status of 12 items pursuant to the dissolution decree: (1) the contract for deed; (2) farm machinery; (3) livestock sales; (4) grain sales; (5) ASCS funds; (6) a ranch checking account; (7) promissory notes; (8) Moore Oil credit; (9) Fairmont timeshare; (10) a Northwest life insurance policy; (11) a Ford Aerostar van; and (12) loans and payments thereon. There was no substantial difference between these items and the 16 identified in the January 12, 1999 order.

¶30 The October order, in turn, attempted to summarize and consolidate the ongoing dispute over these marital assets that had been hashed, and rehashed between the parties since 1997, following George's mother's unsuccessful appeal to this Court regarding the corollary quiet title action. Between April and October of 1998, for example, the parties--including George's mother--filed a total of nine documents with the court related to the accounting and distribution of the marital estate.

¶31 Further, under the January 12, 1999 scheduling order, the only new legal issue of import that the court requested that the parties brief pertained to whether "preservation of the marital assets by husband without contribution by wife entitles wife to increases in value of the assets or income from the assets." This is a legal question which requires research but certainly no further discovery.

¶32 Thus, it is unclear how Joyce was prejudiced by the refusal of the District Court to further delay the disposition of the 1996 decree so that the foregoing issues could be more fully discovered and addressed at the hearing. Furthermore, at the hearing each party was provided the opportunity to offer documentary evidence--most of which was either redundant or irrelevant as the discussion below demonstrates. Counsel for the parties cross-examined witnesses to test the veracity of the offered evidence. And, further, Joyce had the opportunity to call an expert witness on her behalf to provide further evidence of her

version of a proper valuation and distribution. Finally, we cannot fault the court for Joyce's counsel's failure to adequately brief the required issues, which apparently did not pose a problem for George's counsel.

¶33 Furthermore, on appeal, Joyce argues that the discovery she sought primarily related to George's financial affairs and income derived from his operation of the ranch and farm following the 1996 decree, as well as alleged payments made to his mother, that affected the status of the contract for deed debt. These matters, as will be discussed below, are not relevant to the legal determination of any appreciation or decrease to the marital estate. What ultimately will assuage any prejudice to Joyce in this matter is the application of more law, not the discovery of more facts.

¶34 Accordingly, we hold that the January 12, 1999 scheduling order provided Joyce sufficient notice as to what issues would be addressed in the January 25, 1999 hearing, she has not shown sufficient causally related prejudice as a result of the notice, and therefore no violation of due process occurred.

## *Issue 2*

*Did the District Court err by failing to make an equitable division of the marital estate?*

¶35 Joyce contends that the District Court, in making what it termed were "minor adjustments" in its 1999 order, erred by failing to achieve an equitable, fifty-fifty division of the marital estate pursuant to the 1996 decree. Specifically, she contends that the court erred by attributing to her money she never received and deducting debts she should not have to pay. George argues that the court's January 1999 order mirrors, rather than overturns, the 1996 dissolution decree, and is in fact too generous.

¶36 Considering the parties' arguments as a whole in light of both the 1996 decree and the 1999 order, the only asset adjustments made by the District Court in its 1999 order that remain at issue are as follows: the $23,721 in "livestock and sales" allegedly received by Joyce, and the $44,281 in interest that Joyce allegedly owes Ruby pursuant to the contract for deed obligation. Joyce acknowledges that the timeliness of her disputes over such marital asset issues as the ranch account and her personal injury account have grown stale, and concedes to these "adjustments" made by the District Court. Joyce does, however, raise the issue that the court abused its discretion in not taking into account current values of the marital estate. Primarily, she focuses her argument on the post-decree appreciation

of the 1,400 acre ranch and the income George realized in using what she claims were their mutual marital assets. Finally, she also raises the issue of whether the court erred by apparently assigning her decreed judgment to a third-party bank.

¶37 Before proceeding, we first observe that the District Court certainly was acting within its discretion to push this unfortunate, protracted dispute to a final conclusion--as evidenced by its 24-hour turnaround in issuing its final order. However, we also observe that certain fundamental rules governing marital dissolutions must be followed regardless of the evidence presented by the parties, or the imperative for a swift resolution. The parties in this matter have expended considerable time even on appeal pursuing tenuous legal theories, while the controlling law has largely been ignored.

¶38 Therefore, to place this matter in its simplest terms, before proceeding, we find it necessary to reiterate the obvious: pursuant to the 1996 dissolution decree, George does not owe Joyce half of a ranch or a whole Cadillac; there are no longer "marital assets" that need to be equitably divided and distributed; rather, Joyce is owed a money judgment which was given a fixed value in 1996. In this sense, we agree with George's assertion that the only "assets" Joyce was awarded under the decree were "her personal effects and the balance in cash." We conclude that all arguments concerning any apparent ambiguities found within the 1996 decree--which anticipated a timely sale of assets that never materialized--are immaterial at this point. Therefore, how much of this $305,855 decree has been realized by Joyce is the focal issue of our inquiry here.

### A. Livestock and Sales

¶39 Joyce argues that the District Court abused its discretion by crediting Joyce with the receipt of $23,721 in "livestock and sales." We agree.

¶40 George's testimony upon which this figure is based clearly reveals that this sum was allegedly received by Joyce some time in 1994--and that he believes the court in 1996 erred by not including it into the marital assets. Whether or not Joyce received this amount is immaterial. The year alone (which the District Court did not reference in its findings) leads to the inevitable conclusion that this money cannot be deemed a "distribution" that rightfully should be credited against Joyce's judgment. Offsetting the amount due Joyce by this sum was therefore an abuse of discretion, and is reversed and vacated from the order.

### B. Marital Asset Valuation

¶41 Joyce contends that the subsequent appreciation of the marital assets must be accounted for in determining the final disposition of the 1996 decree. George strenuously argues that all financial matters concerning the farm and ranch that have occurred since the court issued the dissolution decree in 1996 are by his hand alone, and Joyce should not realize any gain. In this instance, we must agree with both parties.

¶42 In support of his position, George relies on this Court's decision in *In re Marriage of Wagner* (1984), 208 Mont. 369, 679 P.2d 753. In *Wagner* we recognized that a husband's increased liabilities and the wife's financial success following their separation should not be accounted for in determining the "marital assets," because both were realized after the marital relationship was irretrievably broken, and the "disparity of the parties' business acumen resulted in a change of either's financial status after the separation so that selection of the later date would create an unjust distribution." *Wagner*, 208 Mont. at 380, 679 P.2d at 758. The procedural circumstances in *Wagner*, however, are clearly distinguishable. There, the financial status in question pertained to post-separation and pre-dissolution decree conduct by the parties. Here, we have an uncontested decree in place (aside from the corollary quiet title action), which in turn has been affected by post-decree actions by the parties.

¶43 In contrast to *Wagner*--and more on point--this Court has determined that a district court abused its discretion by not accounting for the substantial difference in the value of marital assets from the court's valuation dates to the time of the dispositional hearing almost three years later. *See In re Marriage of Krause* (1982), 200 Mont. 368, 654 P.2d 963. *But see In re Marriage of Loegering* (1984), 212 Mont. 499, 507-508, 689 P.2d 260, 265 (stating that it was improper to value marital property at the time of dispositional hearing rather than at the time of dissolution 15 months earlier, but concluding that this error was harmless).

¶44 In *Krause*, the delay between an expert's valuation of marital assets and the dispositional hearing was 34 months. Similarly, the delay here between the valuations set forth in the 1996 decree and the dispositional hearing was 31 months. In *Krause,* we observed that a stock holding was valued at $18,000, and by the time of the dispositional hearing had increased to $31,000. "Failure to recognize these kinds of value fluctuations is error." *Krause*, 200 Mont. at 380, 654 P.2d at 969. We identified three essential principles of determining valuation of marital property subject to dissolution: (1) proper valuation is not tied to a specific event, (2) there may be more than one valuation point, depending on the kind of property involved, and (3) preferably, *valuation should occur at the time of*

*distribution, or, stated another way, present fair market values should be used. See Krause*, 200 Mont. at 379, 654 P.2d at 968 (emphasis added). We further stated that these principles are tempered by the rule that a district court has broad discretion in property distribution. *See Krause*, 200 Mont. at 379, 654 P.2d at 968.

¶45 Seemingly, Joyce's assertions are correct that a proper valuation of the marital estate must occur in the present, at the time of "distribution," and therefore the District Court's reliance on the 1996 property values was an abuse of discretion and incorrect. We conclude that although Joyce's arguments on this issue are certainly meritorious, the factual circumstances here are nevertheless clearly distinguishable from our decision in *Krause*.

¶46 In that case we recognized that the appellant was "never divested of her interest in the marital property." *See Krause*, 200 Mont. at 380, 654 P.2d at 969. The original decree in that matter did not determine a liquidated dollar amount to which each party was entitled; rather, the "District Court expressly reserved jurisdiction to make the disposition at a later date." *See Krause*, 200 Mont. at 370, 654 P.2d at 964. Thus, the husband and wife each maintained an interest in certain investment properties following the entry of the decree until the court finally determined what the properties were worth, and what percentage of ownership each party should be entitled.

¶47 Here, under the 1996 decree, George was "granted exclusive possession of the ranch properties, bank accounts and other assets necessary to keep the ranch a viable business entity." Again, contrary to George's argument, Joyce was awarded a liquidated money judgment of $305,855, based on what the court found was a net marital estate of $651,916. Similar to the parties in *Wagner*, from that day forward, they each went their separate ways.

¶48 Thus, as a matter of law, Joyce is not entitled to either appreciation or, conversely, any liability that may have accrued on the property exclusively awarded to George, or arising due to his use thereof subsequent to the court's 1996 dissolution decree. Joyce, however, is substantively correct that her 1996 decree judgment of $305,855 should appreciate-- namely, this sum should accrue judgment interest.

¶49 The District Court indicates in its 1999 order that Joyce "should not be entitled to judgment interest" accruing prior to its order because the maintenance award accounts for what Joyce "would have earned had she had the funds available to invest or had the Court

previously reduced her interests to a fixed amount and awarded judgment interest." This assessment is incorrect as a matter of law. Judgment interest is not "awarded." Rather, judgment interest is a statutory right. Under § 25-9-205, MCA, interest is payable on all judgments recovered at the annual rate of ten percent. Under Rule 54(a), M.R.Civ.P., a "judgment" expressly includes a decree and any order from which an appeal lies. Once a person is liable for a money judgment resulting from a property settlement and payment is not made, the person entitled to the settlement is further entitled to the statutory rate of interest. *See in re Marriage of Gibson* (1983), 206 Mont. 460, 466, 671 P.2d 629, 632-33; *Knudson v. Knudson* (1981), 191 Mont. 204, 208-209, 622 P.2d 1025, 1027. Further, under Rule 31, M.R.App.P., "[i]f a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest."

¶50 On this issue, George directs our attention to the rule that interest is not allowable until the exact amount due is ascertained or is ascertainable. *See In re Marriage of Gerhart* (1990), 245 Mont. 279, 284, 800 P.2d 698, 701. Clearly, the court in its 1996 decree ascertained an exact amount due that was calculated down to the penny. The only uncertainty that remained was whether the $305,855.09 due Joyce would be discharged through a resolution between the parties, or by public sale. In the event of sale, the court reserved some discretion as to interest owed Ruby that may have affected the judgment amount. Again, this event did not occur and, as further discussion below indicates, is no longer material to the resolution of this matter.

¶51 We therefore hold that upon remand, the statutory interest rate of ten percent shall be applied to the resulting balance of Joyce's decree, which began accruing in June of 1996, according to the foregoing discussion. We affirm, however, that no interest accrued during the pendency of this appeal, pursuant to the court's order staying execution issued on March 10, 1999. *See generally* § 27-1-211, MCA (stating that the right to judgment interest excludes period in which debtor is prevented by law or by the act of the creditor from paying the debt).

¶52 We further hold that the District Court's determination that George owes Joyce $19,500 in unpaid maintenance plus interest is accordingly subject to the same rules. Thus, each unpaid monthly maintenance payment has continued to accrue ten-percent interest from the time it was due, until the March 10, 1999 stay of execution, and therefore the court's determination that $20,687 is owed in back maintenance and interest must be recalculated consistent with the foregoing.

## C. Interest Owed to Ruby Pospisil

¶53 Under the foregoing rationale, we explicitly affirm that portion of the court's 1999 order which found that "[t]his Court need not address the amounts due Ruby Pospisil from George Pospisil under the Contract for Deed, or the payments made, as that will be between Ruby and George and does not involve Wife." Disregarding all arguments from both parties, we conclude that who actually pocketed these alleged payments is immaterial.

¶54 We conclude, however, that the District Court abused its discretion when it then arrived at a contradictory conclusion that Joyce must nevertheless share the burden in discharging what appears to have been an illusory interest-accruing debt. Once the District Court entered its decree in 1996, and dismissed Ruby's quiet title action, the contract for deed became an exclusive liability to the party in possession of the ranch and farm, namely George. Again, we must agree with George's argument that all financial matters concerning the operation of the ranch and farm following the 1996 decree are his burdens and benefits that he alone must bear.

¶55 We hold that the District Court abused its discretion when it determined Joyce owed Ruby an additional $44,281, as an adjustment for interest under the 1996 decree. To hold otherwise would clearly disregard the court's 1996 decree which established that George, through his mother, engaged in a "conspiratorial sham." There is substantial evidence that the only person who would gain from interest payments on the contract for deed at this point would be none other than George himself. Accordingly, this sum of $44,281 is hereby reversed and vacated from that order.

## D. Assignment of Interest to First Federal

¶56 Joyce contends that the court abused its discretion by, apparently, assigning some or all of the decreed proceeds to a Lewistown bank, and naming it as a "payee." George suggests that the court "reformed the security agreement to reflect precisely what Joyce and First National Bank of Lewistown agree was security for the loan--her interest in the marital estate, which was her personal items and cash" as set forth in the 1996 decree.

¶57 For obvious reasons, the court's findings and conclusions are less than clear on this issue. Namely, FNB of Lewistown was not a party to this action. The court observed that $26,107 in ASCS funds from the Pospisil ranch and farm operation had been deposited with the court, and that "such amount is hereby made a credit to the sums due Wife

hereunder." The order further states, however, that "[t]he Clerk is instructed to include First National Bank of Lewistown as a payee and secured lienholder in Wife's Dissolution proceeds. It is specifically ordered that all risk of nonpayment or nonreceipt of these funds is assigned to Wife." The court concluded that the final $136,240 judgment amount due to Joyce (after subtracting the foregoing ASCS funds she would receive from the $141,660 adjusted decree and $20,687 award for back maintenance) was "subject to a lien to the First National Bank of Lewistown."

¶58 Whether the court intended to actually assign all of the judgment to a nonparty creditor--and thereby prevent Joyce from actually receiving any proceeds--or simply intended to establish the creditor's status as a lienholder is immaterial. It was an abuse of discretion for the court, in this instance, to establish or adjudicate the rights of a stranger to this action.

¶59 In *Warnack v. Coneen Family Trust* (1994), 266 Mont. 203, 879 P.2d 715, we determined that a person who is not a party to the action cannot be a party to the judgment. We stated that "it is a fundamental principle of our jurisprudence that it is only against a party to the action that a judgment can be taken and that the judgment is not binding against a stranger to the action." *Warnack*, 266 Mont. at 207, 879 P.2d at 718 (quoting *Moore v. Capitol Gas Corp.* (1945), 117 Mont. 148, 156, 158 P.2d 302, 306). We further stated that this same rule applies where a judgment is awarded in favor of a nonparty. *Warnack*, 266 Mont. at 207, 879 P.2d at 718.

¶60 Obviously, the court was concerned about the interests of a party, namely George, whose property may be encumbered by a lien to which he was never a party. Naturally, George would desire that the court "reform" any security agreement in his favor. Accordingly, Joyce may have violated the 1996 decree by first, not transferring title to the property interests as ordered, and second, by using her share of the "marital estate" as security on a loan. At this juncture, however, we will not speculate as to the validity of any security interest that may or may not exist between Joyce and a nonparty. We must therefore reverse and vacate all references made by the court with respect to the rights of First National Bank of Lewistown.

### F. Summary

¶61 We conclude that the District Court incorrectly offset the amount due Joyce under the 1996 decree by attributing to her the receipt of livestock and sales of $23,721, and an

interest debt due Ruby Pospisil for $44,281. We conclude that with these sums added to the $141,660 net due Joyce as determined by the District Court in its 1999 order, the correct judgment is now $209,662. Furthermore, added to this sum is ten-percent judgment interest accrued between June 20, 1996, and March 10, 1999.

¶62 We also conclude that the interest due on the $19,500 of owed maintenance must be recalculated consistent with this opinion. And, finally, all references to any rights of First National Bank of Lewistown found in the 1999 order should be stricken.

¶63 This matter is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER