No. 03-171

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 28

IN RE THE MARRIAGE OF

STEVEN JOHN SHIRILLA,

        Petitioner and Appellant,

  and

NATALIA N. SHIRILLA,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DR 2001-213,
Honorable Kurt Krueger,  Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Patrick D. McGee and Francis P. McGee, Attorneys at Law,
Butte, Montana

    For Respondent:

        Brian T. Atcheson, Attorney at Law, Butte, Montana

Submitted on Briefs:  October 30, 2003

Decided:   February 10, 2004

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1   Appellant Steven Shirilla appeals the findings of fact and conclusions of law of the District Court, dissolving his marriage to Natalia Shirilla. After invalidating the antenuptial agreement, the District Court awarded Natalia the car she had been driving, twenty months of maintenance, and fees for her immigration attorney. Otherwise, each party was to keep the personal and real property that he or she had prior to marriage. We affirm.

¶2   We address the following issues on appeal:

1. Was the antenuptial agreement enforceable? and;

2. Was the division of property and award of maintenance equitable?

## BACKGROUND

¶3   Steven Shirilla (Steve) was a medical doctor in private practice in Butte, Montana, living with his teenage daughter from a previous marriage. In his search for companionship he struck up an internet romance with Natalia, a Russian woman. Steve and his daughter traveled to Russia to meet Natalia and her family face to face. Later, Steve brought Natalia and her son Dmitri to Butte, Montana, under the auspices of a fiancée visa. As their courtship unfolded, they found the time left on the fiancée visa was quickly running out. Steve and Natalia had to decide whether to opt for marriage or to return Natalia and Dmitri to Russia. They opted to marry. After signing an antenuptial agreement, Natalia and Steve were married on September 20, 2000. However, the marriage was not destined to last long. Steve fell down the stairs in his home and suffered a traumatic head injury in December of that same year. On his return home in February, Steve discovered that Natalia had moved out, and his court-appointed

guardian had purchased a new Subaru station wagon for her and was providing money to her for expenses. Shortly thereafter, Steve instituted dissolution proceedings.

¶4     Since the accident and subsequent separation, each party has encountered difficulties. Natalia had problems with her greencard and could not legally work until that matter was resolved. Steve's guardian paid the rent for an apartment for Natalia until Steve regained control of his finances and stopped the payments. Natalia was then forced to stay at a women's shelter and then at various friends' houses. By the time of the hearing in April 2002, she had cleared up the greencard issue, was working a part time job and renting an apartment of her own.

¶5     Because of his head injury, Steve was unable to work as a medical doctor in his private practice. The State Board of Medical Examiners refused to reinstate his medical license until he had been thoroughly reviewed by a teaching hospital with significant experience in head trauma. Meanwhile, the Social Security Administration denied his disability claim, and Steve incurred significant medical costs from his fall. Due to his inability to work, the denial of disability benefits and the mounting medical bills, Steve's financial situation had deteriorated by the time of the dissolution hearing.

¶6     As might be expected, given Natalia's difficulty with the English language, the parties relate different versions of the events surrounding the signing of the antenuptial agreement. Steve claims that on his January 2000 trip to Russia to meet Natalia, they discussed a prenuptial agreement. As proof, he claims to have discussed a prenuptial agreement with a woman from the Russian dating service, who spoke English well. That woman then had a

3

conversation with Natalia in Russian, which Steve did not understand. Natalia flatly denies that any discussion about a prenuptial agreement ever occurred until after she arrived in Montana.

¶7 Once in Montana, Steve attempted to draft a prenuptial agreement using a computer program. Not satisfied with the results, he eventually hired an attorney who drafted an agreement. Natalia, however, refused to sign the agreement because she did not understand what it said. Steve and Natalia traveled to Helena to have a Carroll College foreign exchange student from Kamchatka assist in translating the document to Russian. However, there was still difficulty in translating the document, and Natalia refused to sign. Steve then hired a lawyer in Butte to represent Natalia. The lawyer expressed reservations about having Natalia sign the agreement. However, both Natalia and Steve knew that if they did not get married before Natalia's fiancée visa ran out, Natalia and Dmitri would have to return to Russia, as guaranteed by Steve under the terms of the fiancée visa. Natalia readily admits she did not want to return to Russia since she had quit her job and had given up her interest in the family home, which was sold after she left. Natalia finally signed the agreement which kept their premarital property separate in case of dissolution. The agreement also provided that if the marriage ended before Natalia obtained a permanent visa, Steve would pay for reasonable transportation expenses for Natalia and Dmitri to return to Russia and maintenance to Natalia in the amount of $5,000. If dissolution occurred after two years of marriage, maintenance was to be $7,500.

## DISCUSSION

¶8 Pursuant to § 40-4-202, MCA, a district court has broad discretion to distribute the assets of a marital estate equitably according to the particular facts of a case. *In re Marriage*

4

*of Gerhart,* 2003 MT 292, ¶ 16, 318 Mont. 94, ¶ 16, 78 P.3d 1219, ¶ 16.  Absent clearly erroneous findings or an abuse of discretion, we will uphold a district court's settlement and distribution of property.  *In re Marriage of Pospisil,* 2000 MT 132, ¶ 19, 299 Mont. 527, ¶ 19, 1 P.3d 364, ¶ 19.  A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake.  *Albinger v. Harris,* 2002 MT 118, ¶ 13, 310 Mont. 27, ¶ 13, 48 P.3d 711, ¶ 13.  We review a conclusion of law to determine whether the district court's determination was correct.  *Albinger,* ¶ 13.

¶9      *Was the prenuptial agreement enforceable?*

¶10     Montana has enacted the Uniform Premarital Agreement Act (the Act).    Title 40, Chapter 2, Part 6, Montana Code Annotated.  A "Premarital Agreement" is an agreement made between prospective spouses in contemplation of marriage and to be effective upon marriage.

¶11     The Act provides:

> **Enforcement.**    (1)    A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>> (a) that party did not execute the agreement voluntarily; or
>> (b) the agreement was unconscionable when it was executed . . . .

Section 40-2-608(1), MCA.    Here, the District Court determined that Natalia did not "voluntarily" enter into the contract.

¶12     The term "voluntarily" is not defined by the Act.  When possible, we interpret statutes to give effect to the Legislature's intent.  Section 1-2-102, MCA.  We will also read and construe the statute as a whole to avoid an absurd result and to give effect to a statute's

5

purpose. *Fliehler v. Uninsured Employers Fund*, 2002 MT 125, ¶ 13, 310 Mont. 99, ¶ 13, 48 P.3d 746, ¶ 13. Our previous cases interpreting the Act provide little guidance in interpreting the term. *See, e.g., Marriage of Stout/Gollehon* (1993), 261 Mont. 10, 14, 861 P.2d 856, 858 (fact that wife did not know husband would later terminate lease did not render her execution of agreement involuntary); and *Wilkes v. Estate of Wilkes,* 2001 MT 118, ¶ 12, 305 Mont. 335, ¶ 12, 27 P.3d 433, ¶ 12.

¶13     In interpreting the term "voluntary" as used in the Uniform Premarital Agreement Act, the California Supreme Court looked to the decisions cited by the code commissioners and summarized as follows:

> [T]he party seeking to avoid a premarital agreement may prevail by establishing that the agreement was involuntary, and that evidence of lack of capacity, duress, fraud, and undue influence, as demonstrated by a number of factors uniquely probative of coercion in the premarital context, would be relevant in establishing the involuntariness of the agreement.

*In re Marriage of Bonds* (Cal. 2000), 5 P.3d 815, 825-26. In *Bonds*, the wife, a Swedish national, contended that her difficulty with the English language rendered her signing of the prenuptial agreement "involuntary." The court rejected this argument and concluded that her English was sufficient to fully understand the agreement. *Bonds,* 5 P.3d at 837.

¶14     Two of our previous cases discussed a wife's understanding of a prenuptial agreement. In *Wiley*, a wife sought to invalidate a premarital agreement on the issue of fair disclosure, contending that she only spoke English as a second language and did not understand the agreement. We rejected her challenge noting that she was fluent in English, she had taught college courses and had authored a book in English. *Wiley v. Iverson,* 1999 MT 214, ¶ 25,

6

295 Mont. 511, ¶ 25, 985 P.2d 1176, ¶ 25.  In *Wilkes*, although we discussed a wife's ability to understand the agreement, the issues there were capacity and unconscionability.  *Wilkes*, ¶¶ 9, 17.  Neither of those issues are present here.  Thus, neither case has bearing on the issue of whether Natalia voluntarily executed the prenuptial agreement.

¶15     The circumstances surrounding the signing of the prenuptial agreement suggest that Natalia's signing was not voluntary; rather, under duress, Natalia signed an agreement she did not understand in order to remain in the United States.  Natalia gave up her life in Russia and journeyed to Montana for the purpose of marrying Steve, who had promised she would "be an equal partner for life" and enjoy a wonderful American life.  Only after Natalia had relied on Steve's promises and journeyed to Montana did Steve then present her with a prenuptial agreement, the terms of which she did not understand owing to her difficulty with the language.  Although Natalia was provided her own attorney, he did not speak Russian and any advice given was without the benefit of a translator.  Owing to this continual difficulty with the language, Natalia, at trial, could not say with certainty what advice the attorney gave her.

¶16     Natalia and her son were now in a foreign country, with extremely limited assets.  Thus, not only was Natalia herself completely dependent on Steve, but she also looked to him to provide for her son, Dmitri.  Natalia knew that if she did not marry Steve, she and her son would be forced to return to Russia, an expense which Steve wanted to avoid.  Steve also testified that it was not a good idea for Natalia to return to Russia, because at that time, women returning from the United States were being kidnaped for the purpose of extracting ransom from their friends and families in the United States.  Natalia testified that she did not want to

7

return to Russia, but she knew if she did not marry Steve, she would have no choice. Meanwhile, Steve had effectively communicated that he would not get married until she signed the agreement. The circumstances amount to such coercive pressure that Natalia cannot be said to have voluntarily agreed to be bound to the terms of the agreement. We affirm the District Court's conclusion that Natalia did not execute the contract voluntarily.

¶17 *Was the division of property, allocation of debts and liabilities and award of maintenance equitable?*

¶18 Awards of maintenance and the division of property are to be considered in tandem. *Marriage of Rolf,* 2003 MT 194, ¶ 25, 316 Mont. 517, ¶ 25, 75 P.3d 770, ¶ 25. The statutes governing maintenance and property division encourage providing for the financial needs of a spouse through the award of property rather than maintenance, "with a clear preference for awarding property first." *Rolf,* ¶ 25.

¶19 The District Court's findings of fact did not specifically itemize the properties of each of the parties. However, at Steve's request, the District Court took judicial notice of the accounting filed by Steve's court-appointed guardian. That document indicated that Steve's net worth had declined from $744,180 on December 31, 2000, to $641,902.95 on June 30, 2001. The District Court was also apprised of the few possessions Natalia brought to the marriage as well as her earnings since the parties separated.

¶20 Here, the District Court awarded each party the possessions he or she brought to the marriage. In addition, to put Natalia in a position to be economically self-sustaining, the court

8

awarded the Subaru station wagon to Natalia and ordered Steve to pay the fees for her immigration attorney as well as maintenance in the amount of $1,000 for twenty months.

¶21   An award of maintenance is governed by § 40-4-203, MCA.   Such an award is only appropriate when the court finds that the spouse seeking maintenance:

(a) lacks sufficient property to provide for his reasonable needs; and
(b) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

Section 40-4-203(1), MCA.   Substantial evidence supports the District Court's order of maintenance.   Natalia and Dmitri came to Montana with very little in the way of property and Natalia clearly lacks sufficient property to provide for her reasonable needs.   Also, Natalia only earns approximately $8.00 per hour, working twenty hours per week.   Although otherwise able bodied and competent, Natalia's limited English makes it   difficult for her to obtain more lucrative employment.   These facts support both prongs of § 40-4-203(1), MCA.   Thus, despite the preference for awarding property, the award of maintenance is appropriate.

¶22   Various statutory factors determine the appropriate level of maintenance.   Section 40-4-203(2), MCA.   Here, the District Court awarded Natalia $1,000 a month for twenty months. The evidence supports an award in this amount.   Natalia will need time in which to take classes to work on her English proficiency so that she will be more employable. Despite the depletion of Steve's assets, he is able to afford Natalia's maintenance and still continue to provide for his own needs.   Section 40-4-203(2)(f), MCA.

¶23   It is clear that the division of property and award of maintenance were intended to give each of the parties essentially the assets they had prior to the marriage and to put Natalia in a

9

position to support herself. Uncontradicted testimony indicated that Natalia could not get around town or get to work without a vehicle. Similarly, she would not have been able to obtain legal residency and thus the capacity to hold a job without the assistance of her immigration attorney. Steve voiced no objection to the evidence of Natalia's immigration attorney's fees. Under the unique circumstances of this case, requiring Steve to pay her immigration legal fees is a legitimate allocation of marital debt.

¶24 The findings of the District Court were not clearly erroneous, and the court did not abuse its discretion. The order of the District Court is affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE

Justice Jim Regnier concurring and dissenting.

¶25 I agree with all that is said in this Opinion with the exception of requiring Steve to pay Natalia's attorneys fees associated with her immigration proceedings. Section 40-4-110, MCA, sets forth the statutory authority for an award of attorneys fees in a dissolution proceeding. Obviously, Natalia's attorneys fees do not fall within the provision of the statute. The award of fees in this instance is for an unrelated matter, that is, fees which Natalia has incurred in connection with her immigration to the United States. Although I appreciate the

unique aspect of the matters presented in this case, in my view, the award of the immigration legal fees cannot be justified as a legitimate allocation of marital debt.

/S/ JIM REGNIER

Chief Justice Karla Gray joins in the foregoing concurrence and dissent.

/S/ KARLA M. GRAY