FILED

09/20/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0259

DA 21-0259

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 179

IN RE THE MARRIAGE OF:

CHELSEY E. GEORGE, f/k/a
CHELSEY E. FRANK,

      Petitioner and Appellant,

   and

MICHAEL E. FRANK,

      Respondent and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis and Clark, Cause No. ADR-2019-50
                Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       David B. Cotner, Cotner Law, PLLC, Missoula, Montana

       For Appellee:

       Molly K. Howard, J.R. Casillas, Datsopoulos, MacDonald & Lind, P.C.,
       Missoula, Montana

                     Submitted on Briefs:  January 19, 2022

                             Decided:  September 20, 2022

Filed:

                     _____
                               Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Chelsey E. George, f/k/a Chelsey E. Frank (Chelsey), appeals the April 22, 2021 Findings of Fact, Conclusions of Law and Order of the First Judicial District Court, Lewis and Clark County, distributing the marital estate and calculating child support after her dissolution of marriage from Michael E. Frank (Mike). We restate and address the following issues:

1. *Whether the District Court abused its discretion regarding the division of property.*

2. *Whether the District Court abused its discretion in calculating child support.*

3. *Whether the District Court's adoption of Mike's proposed Findings of Fact and Conclusions of Law warrants a new trial.*

¶2 We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Chelsey and Mike married in November 2007 and separated on November 1, 2018. On January 8, 2019, Chelsey filed a petition for dissolution, seeking equitable distribution of assets and liabilities, a parenting plan for their child, E.F. (age 11), child support, health insurance, maintenance, and attorney fees. On June 7, 2019, the parties filed a Stipulated Final Parenting Plan, agreeing to a 50/50 split of parenting time and resolving all issues except child support. The parenting plan, adopted by the District Court on June 29, 2020, requires Mike to pay E.F.'s health, dental, and vision insurance premiums, and all uncovered medical expenses, as well as 50% of E.F.'s extracurricular activity expenses. From November 2018 until September 30, 2019, Mike paid Chelsey $1,500 per month in

2

temporary family support. In September 2019, the parties stipulated that Mike would receive $50,000 from the estate and Chelsey would receive a lump sum of $100,000 from the estate. Mike also agreed to pay Chelsey $5,000 per month in support. The parties received $25,000 each for attorney fees.

¶4 The matter proceeded to trial in June 2020. Six witnesses testified, including three experts, and 260 exhibits were admitted over three days. The parties submitted post-trial briefing and proposed findings of fact and conclusions of law. The parties stipulated to the entry of a decree of dissolution on June 26, 2020, reserving the contested issues from trial to be decided by the District Court. The District Court filed its Findings of Fact, Conclusions of Law and Order on April 22, 2021.

¶5 Chelsey appeals, asserting that the court's division of property was clearly erroneous, resulting in an abuse of discretion and requiring remand for a new trial. Chelsey also argues on appeal that the court abused its discretion by deviating from the child support guidelines and improperly adopted verbatim Mike's proposed findings of fact and conclusions of law.

**Financial History**

¶6 When Mike and Chelsey married, Mike was 40 years old and was the Vice President of Corporate Integrity in the Human Resources Department at Blue Cross Blue Shield of Montana (BCBS). Mike was earning $135,701 per year. Chelsey was 31 years old and worked for Helena-based George's Distributing, Inc., her family's business. Chelsey was earning $86,388 per year. By December 2010, Mike was the President and the Chief Executive Officer (CEO) at BCBS, making $405,819 per year. Mike later became an

executive in Healthcare Service Corporation (HCSC), the company that acquired BCBS in 2013, and was earning a base salary of approximately $520,000 per year.

¶7 Mike's HCSC compensation package included an annual performance incentive (API) that rewarded employees for hitting short-term performance goals over the previous 12-month period, and a long-term incentive program (LTIP) that was based on performance over a three-year period. Both the API and the LTIP allowed Mike to defer up to 100% of this income into a Master Deferred Compensation Plan. The incentive plans do not accrue during the performance period. They are paid during the first quarter of each future projection year; they are not guaranteed; and they are unfunded. The plans are non-assignable and cannot be transferred.

¶8 Chelsey and Mike primarily lived on Chelsey's income and Mike's base pay throughout their marriage. Mike and Chelsey agreed that Mike should defer almost all his bonus income into retirement so that he and Chelsey could put money aside for the future. During the three years prior to trial, Mike's income totaled $2,495,314 (2017), $2,619,992 (2018), and $3,052,951.71 (2019). Chelsey's income totaled $247,903 (2017), $152,599 (2018), and $115,345 (2019). By the date of trial, the marital estate exceeded $16,000,000. Chelsey testified that she had no idea how much money Mike was putting away and was shocked to learn through the discovery process that Mike was making between $2 and $3 million per year.

¶9 After the parties physically separated, they maintained separate personal checking accounts and credit cards. Mike continued to manage the parties' real property and joint finances. Mike and Chelsey purchased a residence in the same neighborhood as the family

4

home in both of their names so that Mike could live near E.F. The parties continued to jointly own three other parcels of real property until March 2020, when they decided to sell their Big Sky home and put the net proceeds in a joint account. Since their separation, Mike has paid all mortgages, real estate taxes, and insurance, as well as all maintenance expenses related to their real property holdings, including housekeeping, landscaping, and remodeling expenses for Chelsey's residence. Mike also paid all income taxes and some, but not all, of Chelsey's medical bills during the separation.

## Date of Separation Valuation

¶10 The parties dispute whether the marital estate should be valued as of the date that the parties separated, November 1, 2018, or June 2020, closer to the date the parties' marriage was dissolved. The estate includes several jointly-owned real properties and vehicles, as well as multiple shared and individual checking, investment, and retirement accounts, $1.2 million in premarital contributions, and $1.5 million in liabilities.[1]

¶11 Chelsey testified that the parties continued to comingle their finances and other assets after they separated. She testified that she and Mike went to counseling together until shortly before the end of 2018. She testified, "Even when we were so-called separated, we still bought a house together, because we were working on our marriage. . . . I took care of [E.F.] the majority of the time for . . . the first five months of 2019." Chelsey

---

[1] The parties dispute whether the marital estate should also include Mike's bonus incentives received post-separation and Chelsey's ownership interest in George's Distributing. Both issues are discussed in detail below.

5

contended that Mike traveled 31 times in 2019, during which time she had sole parenting responsibilities. Chelsey traveled as well, roughly 15 times between 2019 and early 2020.

¶12 Mike testified that the parties did not live together or operate as a family unit post-separation. He testified that he solely supported the marital estate financially during the separation and felt that a later valuation date would create an unjust distribution in Chelsey's favor because "once we were separated, there were no contributions from Chelsey to, you know, my work, my home, or otherwise."

¶13 At the close of the trial, the District Court discussed its inclination to value the marital estate at the date of separation and announced that the court would accept post-trial briefing on the issue. The District Court stated:

> In nearly every case that I have, the parties' marital estate is essentially assessed on the day that they split up . . . . I understand Chelsey's position here is that she worked incredibly hard during the years of their marriage in order to help Mike succeed in his position. I mean, I get that. That testimony came through loud and clear. But it's hard for me to say that that continued -- you know -- we know that it didn't continue to occur after November 1st, 2018. Mike continued to have success and continued to rise in the ranks of the corporation at HCSC. So it's hard for me to attribute that portion of Mike's income or success to the marital estate when the parties clearly had separated prior to that time.

¶14 Both parties submitted post-trial briefing on the issue. The court concluded that the date of separation was appropriate because "[b]ased on the evidence presented . . . the parties were separated and the marital relationship was terminated on or before November 1, 2018." The District Court found that "Chelsey made no contributions, non-monetary or otherwise, which facilitated the receipt or maintenance of any property." The District Court determined that "[t]o include in the valuation of the marital estate the accumulation

6

of assets or growth of assets after the parties' separation would effectuate an injustice and frustrate the intended purpose of equitable property division."

## Retirement Accounts

¶15    The parties agreed at trial that Chelsey should receive a portion of Mike's two-part pension plan divided in accordance with *In re Marriage of Rolfe*, 234 Mont. 294, 298-99, 766 P.2d 223, 226-27 (1988) ("*Rolfe II*"), where the court determined the marital interest of the ex-husband's retirement benefits by dividing the length of the ex-husband's employment during the marriage by the ex-husband's entire length of employment and applying the fraction to all future benefit payments.

¶16    Mike argued that the numerator 11 should be used to calculate both parts of the pension plan, representing Mike's years of service from the date of marriage through the date the parties separated.  Chelsey argued that the numerator 12.5 was appropriate, representing the parties' years of marriage through the date of trial.  The District Court agreed with Mike, finding that "Mike's overwhelming financial support of the marital estate since separation . . . supports utilizing a numerator of 11."

¶17    The terms of Mike's HCSC Master Deferred Compensation Plan provide that the plan is not fully vested until the earliest occurrence of any of the following events:

1.  the participant's 65th birthday;
2.  the death of the participant;
3.  separation from service due to the disability of the participant;
4.  separation from service due to involuntary termination of the participant's employment without cause;
5.  separation from service due to voluntary termination of the participant's employment for good reason within twelve months following a change in control; or
6.  termination of the plan.

¶18     Mike is 55 years old.  The following table shows the contributions Mike made to his various retirement accounts post-separation, including to his HCSC Master Deferred Compensation Plan and two Merrill Lynch accounts, which he funded with monies received from his 2019 and 2020 API and LTIP bonuses:[2]

| Date | Account | Amount | Incentive | Years earned |
|---|---|---|---|---|
| March 15, 2019 | HCSC | $26,366.46 | 2019 API | 2018 |
| March 15, 2019 | HCSC | $74,088.00 | 2019 LTIP | 2016, 2017, 2018 |
| April 22, 2019 | Merrill Lynch 2647 | $932,901.91 | 2019 LTIP | 2016, 2017, 2018 |
| March 13, 2020 | HCSC | $447,338.31 | 2020 API | 2019 |
| March 13, 2020 | HCSC | $1,000,008.00 | 2020 LTIP | 2017, 2018, 2019 |
| March 13, 2020 | Merrill Lynch 2894 | $673,015.51 | 2020 LTIP | 2017, 2018, 2019 |

As of April 30, 2020, the balance of Mike's HCSC Master Deferred Compensation Plan was $10,025,724.01.

¶19     At trial, Mike testified that he believed it was fair that Chelsey should receive a portion of the bonuses and deferred compensation that he earned while the parties were married and until the date of their separation.  Chelsey argued that the accounts should be valued as of the date of dissolution and equally split.  Chelsey proposed that, because of the deferred compensation plan's complex structure and limitations, Mike should continue

---

[2] On March 15, 2019, Mike deferred $16,276.90 from his 2019 API to his Prudential 401(k) retirement account.  On March 13, 2020, Mike deferred $16,926.92 from his 2020 API to his 401(k).  The parties agreed at trial that Mike's 401(k) should be awarded in its entirety to Mike.

8

to hold the account and act as fiduciary of her interest until a qualifying event under the plan. Mike argued against being a fiduciary for Chelsey's assets, citing potential future conflicts and administrative burden, and emphasizing his preference to have the marriage dissolved with a "clean break."

¶20 After adopting the date of separation valuation "for all assets," the District Court declined to include either of Mike's APR and LTIP-funded Merrill Lynch bonus accounts in the marital estate because, the court reasoned, those accounts were established and "funded post separation by monies earned solely by Mike after the parties separated."

¶21 The District Court awarded the HCSC Master Deferred Compensation Plan entirely to Mike with a post-tax valuation of $4,553,177.60, finding that awarding this asset to Mike was equitable "[d]ue to the fact that this asset represents nothing more than a promise to pay in the future, that it is unsecured, that it cannot be divided, transferred or pledged," and that Mike made "significant post separation contributions to this account" while "Chelsey did not contribute to Mike's additions to these accounts after November 1, 2018." The District Court also found the parties would be best served by completely dividing their financial lives as part of the dissolution; therefore, the court declined to require Mike to act as fiduciary in managing the deferred compensation plan for Chelsey.

¶22 Included in the District Court's valuation of Mike's HCSC Deferred Compensation Plan were estimated state and federal income taxes and other tax consequences, which Mike argued would certainly be applied when funds were distributed. Mike testified that he has no present intentions to retire. When Chelsey's counsel asked him to clarify his

proposal for dividing the deferred compensation plan equitably at trial, Mike testified as follows:

> COUNSEL: And you would have $15.48 million, less the amount of money you borrowed to pay to Chelsey, which is -- if it's 2.5, you would have $13 million, and she would have 8; correct?
>
> MIKE: I don't agree with the math.
>
> COUNSEL: So what's 15.5 minus 2.5?
>
> MIKE: No. The part I don't agree with is that the $10 million that you've identified under the master deferred comp is still subject to tax. So I think that number needs to be moved to $5 million, because that's the actual present day value of it. Even though I can't receive it, it's still going to be subject to tax.

¶23 The parties stipulated to allowing Benjamin Yonce, CPA, CVA to perform tax calculations and produce a report assigning after-tax values to the accounts as of November 1, 2018, and June 1, 2020.[3] The District Court accepted Yonce's net-of-tax value of $4,553,177.60 as of November 1, 2018, finding it credible and representative of the true present value of the asset.

¶24 Valuing the deferred compensation plan at its post-taxation value, using the date of separation valuation, applying the court's formula from *Rolfe II* with a numerator of 11 to Mike's two-part pension plan, and subtracting all liabilities from Mike's portion of the estate ($1,466,214), the District Court required Mike to pay Chelsey $1,234,758.75 to equalize the marital estate. Chelsey's expert calculated an equalization payment after tax

---

[3] The District Court found that the parties stipulated to a tax calculation from Yonce; however, the record indicates that while the parties stipulated to allowing Yonce to perform and present tax calculations, Chelsey did not stipulate to their application.

of between $2,729,205.66 and $3,107,456.76 by including "all assets" and the growth of the parties' various investment accounts after November 1, 2018.

**George's Distributing**

¶25 George's Distributing is owned by Chelsey's father, Jim George. In 1994, Jim gifted 200 shares of the company to Chelsey. From 2007 to 2014, Jim regularly transferred shares of the company to Chelsey. In 2012, 2013, and 2014, Chelsey elected to split her annual gift of shares with a trust she established for E.F. The value of the marital estate initially excluded Chelsey's interest in George's Distributing, which was around 33% of the company at the date of trial. Chelsey also serves as trustee of E.F.'s 11% ownership interest in George's Distributing.

¶26 At trial, Jim testified that the stock transfers were never compensation for work that Chelsey had done for the company but were a part of his family's tradition of gifting ownership interest in the family business, and also served his and his wife's estate planning goals at the time. In 2015, Jim stopped gifting because, as Jim testified, he "wanted control. I was still in the business, and . . . I didn't want to give up more than 50 percent." In 2009, Chelsey and Mike acquired 200 shares that had been gifted to Chelsey's sister as part of their reimbursement for a loan they made to George's Distributing in 2008.

¶27 From 2007 to 2018, George's Distributing's annual gross sales more than doubled. Despite her role as the President of George's Distributing, Chelsey was the company's ninth-highest paid employee in 2018, with a base salary of $63,000 per year—more than $20,000 per year less than she was making in 2007 when she married Mike.

11

¶28 When E.F. was born, Chelsey testified that she hired a general manager and two sales managers to allow her to focus on raising E.F. and prioritize supporting Mike in his new role as CEO. Chelsey testified, "George's suffered because I had to devote, you know, a lot of time at home." Both parties testified they had a successful "partnership."

¶29 At trial, the parties disputed the value of Chelsey's interest in George's Distributing. Chelsey hired Thomas Copley, CPA, who valued Chelsey's interest at $502,988 as of December 31, 2019, and later modified that valuation to $654,000 after changing his methodology in response to Mike's motion in limine to exclude his report. Mike hired Patrick L. Anderson, a business consultant and economist from East Lansing, Michigan, who specializes in franchise industries, including beer and wine distributorships. Anderson valued Chelsey's interest at $2.56 million as of May 1, 2020.

¶30 The District Court adopted Anderson's valuation. The court reasoned that Anderson's valuation report was industry-specific, narrowly tailored, and credible, while the court found that Copley "has no particular expertise in valuing interest in a wine and beer distributorship." The court accepted Anderson's May 1, 2020 valuation date without any discussion related to the specific valuation date used, and notwithstanding the court's ruling that it would use November 1, 2018, the date the parties separated, as the valuation date for the marital estate.[4] The District Court included George's Distributing in the marital

---

[4] At trial, Anderson testified that "there's no real difference [in the value of George's Distributing] between if this was January 1 or May 1. I mean, this company is very stable, profitable, growing. It's going to be that way. It was that way on January 1, and it's that way on May 1." Neither Anderson, nor Copley, offered testimony as to the company's valuation as of November 1, 2018.

12

estate, applied Anderson's valuation as of May 1, 2020, and gave Chelsey a $27,494 credit for her 200 shares acquired pre-marriage.

**Child Support**

¶31  Utilizing only the parties' base pay figures of $520,000 per year for Mike and $63,000 per year for Chelsey, the District Court awarded Chelsey $1,629 per month in child support from Mike. The District Court acknowledged that this amount represents a deviation from the guidelines, but deemed that the variance was necessary to accurately reflect the true monthly income of the parties, the variance would not adversely affect the child's standard of living, and that following the guidelines in this case would be unjust to Mike and result in a windfall to Chelsey.

**STANDARDS OF REVIEW**

¶32  A district court's findings of fact in a division of marital property are reviewed to determine whether they are clearly erroneous. *In re Marriage of Swanson*, 2004 MT 124, ¶ 12, 321 Mont. 250, 90 P.3d 418. We review a district court's conclusions of law for correctness. *Schwartz v. Harris*, 2013 MT 145, ¶ 15, 370 Mont. 294, 308 P.3d 949. "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or our review of the record convinces us that the district court made a mistake." *In re Marriage of Crowley*, 2014 MT 42, ¶ 24, 374 Mont. 48, 318 P.3d 1031. If the findings are not clearly erroneous, the court's division of property will be affirmed absent an abuse of discretion. *In re Marriage of Funk*, 2012 MT 14, ¶ 6, 363 Mont. 352, 270 P.3d 39. A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial

13

injustice. *In re Marriage of Alexander*, 2011 MT 1, ¶ 11, 359 Mont. 89, 246 P.3d 712. "We examine each case individually, with an eye to its unique circumstances." *In re Marriage of Hutchins*, 2018 MT 275, ¶ 7, 393 Mont. 283, 430 P.3d 502.

¶33 We review a district court's child support award for an abuse of discretion. *In re Marriage of Anderson*, 2014 MT 111, ¶ 11, 374 Mont. 526, 323 P.3d 895.

¶34 A district court's conclusions of law are reviewed de novo to determine whether they are correct. *Giambra v. Kelsey*, 2007 MT 158, ¶ 28, 338 Mont. 19, 162 P.3d 134.

## DISCUSSION

*1. Whether the District Court abused its discretion regarding the division of property.*

¶35 Section 40-4-202, MCA, vests the district court with broad discretion to equitably apportion the marital estate in a manner equitable to each party according to the circumstances of each case. *Marriage of Funk*, ¶¶ 16, 19 ("This directive applies to all assets, including pre-acquired property and assets acquired by gift, bequest, devise, or descent."). "The theory of equitable distribution recognizes, and attempts to compensate for, each party's contribution to the marriage." *In re Marriage of Bartsch*, 2007 MT 136, ¶ 20, 337 Mont. 386, 162 P.3d 72. The statute requires an equitable, but not necessarily equal, division of the marital estate, however and whenever acquired. *Marriage of Hutchins*, ¶ 31; *Marriage of Funk*, ¶ 34.

¶36 When distributing the marital estate, a district court "focuses on the overall distribution of the entire marital estate and not an item by item accounting." *In re Marriage of Hochhalter*, 2001 MT 268, ¶ 37, 307 Mont. 261, 37 P.3d 665 (citing *In re Marriage of Baer*, 1998 MT 29, ¶ 36, 287 Mont. 322, 954 P.2d 1125). This Court does not attempt on

14

appeal to review every element of a complex property distribution. *In re Marriage of Richards*, 2014 MT 213, ¶¶ 24, 38, 376 Mont. 188, 330 P.3d 1193; *Marriage of Hochhalter*, ¶ 37 (citing *In re Marriage of Gallinger*, 221 Mont. 463, 468-69, 719 P.2d 777, 781 (1986)).

¶37 Chelsey contends the District Court's findings regarding the division of property were clearly erroneous because the court incorrectly used the date of separation to value significant assets, failed to include all assets, failed to consider significant post-separation growth of certain assets, and improperly included tax consequences as a liability for Mike's investment accounts when no imminent liquidation was contemplated. Chelsey contends that the District Court also erred by including her gifted shares in George's Distributing in the marital estate, erred in valuing George's Distributing near the date of dissolution, and erred in adopting Anderson's valuation of George's Distributing. Finally, Chelsey contends the District Court failed to consider the statutory factors of § 40-4-202(1), MCA, specifically Mike's ability to acquire significant capital, in distributing the marital estate. Chelsey asserts that these errors amount to an abuse of discretion requiring remand and a new trial.

¶38 Mike argues the District Court's findings are not clearly erroneous because they are supported by substantial evidence, including three days of trial testimony and extensive post-trial briefing on all issues raised on appeal. Mike further asserts that Chelsey waived her right to seek a new trial by failing to move for one before appealing, and fails to satisfy any of the grounds set forth in §§ 25-11-102 and -103, MCA.

15

## Valuation Date

¶39     "Generally, valuing the property near the time of dissolution results in equitable apportionment, but unique circumstances may call for valuation at a different time." *Marriage of Alexander*, ¶ 16.   "When conflicting valuation evidence is presented the district court must indicate the basis for its determination.  If no explanation is made the court has abused its discretion."  *In re Marriage of Rolfe*, 216 Mont. 39, 46, 699 P.2d 79, 83 (1985) ("*Rolfe I*").  As long as the court's valuation is reasonable in light of the evidence submitted, we will not disturb the finding on appeal.  *Marriage of Alexander*, ¶ 16.

¶40     Equitable apportionment is more important than "designating the moment" at which the court should value marital property.  *Schwartz*, ¶ 18.  This Court has affirmed a district court's use of the date of separation where the parties "began managing their finances separately and eventually lived separately from that time."   *Schwartz*, ¶ 18 (internal quotations omitted); *see also In re Marriage of Tipton*, 2010 MT 144, ¶ 24, 357 Mont. 1, 239 P.3d 116; *In re Marriage of Williams*, 2011 MT 63, ¶ 26, 360 Mont. 46, 250 P.3d 850 ("[T]he date of separation can be used as the appraisal date when one spouse accrued significant wealth and the other accrued significant debts after the parties had separated but before formal dissolution.").

¶41     In *Schwartz*, the husband continued to manage the wife's finances and rental properties, and the family unit remained largely intact during the separation—the husband and wife had almost daily phone contact, they traveled together to the children's sporting events, vacationed together, and gave the children joint Christmas and birthday gifts. *Schwartz*, ¶ 19.  We determined that, although the parties had been separated since 2002,

the trial court did not abuse its discretion in using the 2009 property values to distribute the marital estate because the parties "continued to function as a family unit." *Schwartz*, ¶¶ 19-20 (internal quotations omitted). We stated, "We are not persuaded that the circumstances here required use of the 2002 property values to avoid unfairness or inequity." *Schwartz*, ¶ 20. In *Marriage of Tipton*, we affirmed a trial court's valuation date of approximately one year after the parties' separation and one year prior to their dissolution because the parties were neither living together nor comingling their assets by that time. *Marriage of Tipton*, ¶ 24 (finding deviation from the general rule was justified "based on the unique circumstances of [the] case").

¶42 The District Court used the date of the parties' separation, November 1, 2018, as the valuation date to equitably divide the majority of the parties' assets, including several large investment accounts, as well as Mike's pension and deferred compensation plan. The court summarily held that "the parties were separated and the marital relationship was terminated on or before November 1, 2018," reasoning that "Chelsey made no contributions, non-monetary or otherwise, which facilitated the receipt or maintenance of any property."

¶43 The record reflects that during the approximately 20 months between the parties' separation and decree of dissolution. Mike continued to perform his traditional role in the family of managing the parties' real property and joint finances; the parties continued to jointly own multiple parcels of real property until March of 2020; they jointly purchased a home and sold a home during that time; and they maintained separate and comingled finances. Chelsey's unrefuted testimony was that she and Mike "were working on [their] marriage"; they attended couples' counseling together through December 2018; and she

17

was E.F.'s primary caretaker for at least the first five to seven months of the parties' separation, notwithstanding the parties' agreed-upon 50/50 parenting arrangement.

¶44 By valuing the marital estate as of the date of separation, the District Court also excluded 100% of Mike's API and LTIP payments from the marital estate, even though the majority of those payments were based on work Mike performed before the parties were even separated. For example, Mike's 2019 API was based on work performed in 2018; therefore, 83.3% of that payment was earned before the parties separated. Mike's 2019 LTIP payments were based on work performed in the years 2016 through 2018; therefore, 94.4% of those payments were earned before the parties separated. By using the date of separation, though, the District Court excluded 100% of all API and LTIP payments because they were not actually paid out until after November 2018.

¶45 While a district court has broad discretion in equitably apportioning the marital estate, and "unique circumstances may call for" a valuation date other than the generally accepted practice of valuing property near the time of dissolution, the valuation must "be reasonable in light of the evidence submitted." *Marriage of Alexander*, ¶ 16. It is incumbent upon a district court to explain the basis for its deviation, and that explanation must be supported by the evidence in the record. *Rolfe I*, 216 Mont. at 46, 699 P.2d at 83.

¶46 The theory of equitable distribution undeniably recognizes, and attempts to compensate for, each party's contribution to the marriage. *Marriage of Bartsch*, ¶ 20. The District Court had a duty to adequately explain the inconsistencies in the record with its decision to deviate from the general rule of valuing the parties' marital property as of the date of dissolution. The court's conclusory explanation falls short of "reasonable in light

18

of the evidence submitted." *Marriage of Alexander*, ¶ 16. We are not persuaded that unique circumstances required the court to value the majority of the parties' assets as of the November 2018 separation date to avoid unfairness or inequity. To the contrary, by using the date of separation as the point at which the estate was valued, the court excluded entirely Mike's API and LTIP payments that were undisputedly based, to a great degree, on work Mike performed pre-separation. The District Court abused its discretion "as manifested by a substantially inequitable division of the marital assets resulting in substantial injustice." *Marriage of Hutchins*, ¶ 7.

### Retirement Accounts

¶47 Chelsey maintains that the District Court erred by valuing specific significant assets of the estate, such as Mike's pension and HCSC Master Deferred Compensation Plan, at the date of the parties' separation because her contributions to Mike's success both during their marriage and post-separation entitle her to one-half of his pension and all deferred income Mike earned through the date of trial. Mike relies on *Marriage of Hutchins* to argue that the District Court's valuation date of separation was appropriate for his pension and asserts that, as in *Marriage of Hutchins*, Chelsey is not entitled to any deferred compensation he received after the parties separated. On appeal, Chelsey claims that by ignoring the increase in value of the marital estate over the parties' separation, and by awarding all post-separation marital assets and growth to Mike, the marital estate was reduced by more than $5,000,000.

¶48 It is well-established in Montana that retirement benefits are part of the marital estate. *Rolfe II*, 234 Mont. at 296, 766 P.2d at 225. Valuing pensions presents several

problems, including what value, if any, should be assigned to nonvested benefits. *Rolfe I*, 216 Mont. at 46, 699 P.2d at 83 (citing *In re Marriage of Brown*, 544 P.2d 561, 562-63 (Cal. 1976) ("Pension rights, whether or not vested, represent a property interest; to the extent that such rights derive from employment during coverture, they comprise a community asset subject to division in a dissolution proceeding.")).

¶49     At trial, the parties agreed that Chelsey should receive a portion of Mike's two-part pension plan divided in accordance with our holding in *Rolfe II*.  Mike argued that the numerator 11 should be used in both calculations, representing Mike's years of service from the date of marriage through the date the parties separated.  Chelsey argued that the numerator should be 12.5, representing the parties' years of marriage through the date of trial.  The District Court agreed with Mike, finding the parties' post-separation acquisitions were the result of their individual efforts and holding the facts of the case supported utilizing a date of separation valuation for the pension.

¶50     In *Marriage of Hutchins*, the trial court apportioned four investment accounts to the husband using the date of the parties' financial separation, which was several months after their physical separation.  *Marriage of Hutchins*, ¶¶ 56, 63.  The wife argued that she was entitled to the increase in value of the accounts between the court's valuation date and the date of dissolution.  *Marriage of Hutchins*, ¶ 57.  We affirmed, explaining that the date of financial separation was appropriate because "unique circumstances existed"; the parties had separated their finances and did not comingle assets after that time, and the wife "was not necessarily entitled to the increase in the accounts' values after the parties separated." *Marriage of Hutchins*, ¶¶ 63, 65.

¶51 As discussed above, *Marriage of Hutchins* is distinguishable from the present case because Mike and Chelsey did not financially separate in November 2018 when they physically separated. Unlike *Marriage of Hutchins*, the parties here continued to comingle finances well into the following year as the dissolution proceedings carried on. Because we have determined that unique circumstances did not exist to justify the District Court's use of the date of the parties' separation, the District Court erred by utilizing the numerator 11 to calculate Chelsey's portion of Mike's two-part pension plan pursuant to *Rolfe II*.

**Exclusion of Marital Assets and Growth**

¶52 At trial, Mike conceded that the District Court should value certain significant assets related to his deferred compensation plan at the parties' dissolution date because he believed that Chelsey had contributed to the earnings in those investment accounts pre-separation, and thus she was entitled to the increase in value over the course of the parties' separation. Mike testified that Merrill Lynch account 2647 ($932,901.91) was his 2018 API bonus paid in 2019, and Merrill Lynch account 2894 ($673,015.51) was funded with monies from his LTIP bonus paid in 2020, which included earnings from 2017 and 2018. However, in post-trial briefing, Mike submitted a new proposed apportionment identifying all assets as of the date of separation and labeled each of these accounts as "Established post separation." The District Court awarded the accounts, in their entirety, to Mike, finding that "Merrill Lynch accounts 2647 and 2894 were funded post separation by monies earned solely by Mike after the parties separated."

¶53 Chelsey argues on appeal that by ignoring the undisputed testimony that at least some of Mike's API and LTIP earnings were marital assets, she was deprived of almost

21

$2 million. She contends that by effectively freezing the value of the marital estate and all of the parties' investment accounts at the date of separation, and then by making calculations based on that fixed amount and not a percentage of the account at the time of the actual division of property, the court effectively awarded all of the growth of those assets during the pendency of the dissolution proceedings to Mike. In other words, Chelsey argues that while her portion of the asset continued to grow while the parties were separated, the District Court failed to award her any of that growth. Chelsey argues that although the District Court fixed her share of the marital estate as of November 1, 2018, she did not receive any of the assets at that time, and had no control over those assets during that time. By default then, Mike earned a windfall by getting to keep the growth of both his and Chelsey's portion of the funds.

¶54   To support its decision to exclude assets acquired post-separation or increases in the value of assets that existed as of the date of separation, the District Court relied primarily on this Court's decision in *In re Marriage of Wagner*, 208 Mont. 369, 679 P.2d 753 (1984), which is distinguishable.[5] In *Marriage of Wagner*, after separating from her husband, a wife borrowed money from her family to establish a new ranching operation that generated significant profits. *Marriage of Wagner*, 208 Mont. at 373, 679 P.2d at 755. Conversely,

_____

[5] The District Court also analyzed two non-cite cases, *In re Marriage of Gallagher*, No. DA 01-0871, 2003 MT 124N, 2003 Mont. LEXIS 211, and language from the dissent in *In re Marriage of Jolly*, No. DA 05-0439, 2006 MT 352N, 2006 Mont. LEXIS 685. Because these are non-cite cases with no precedential value, we will not consider them here. *See State v. Ferre*, 2014 MT 96, ¶¶ 15-16, 374 Mont. 428, 322 P.3d 1047 ("It is well-established that unpublished orders and opinions from this Court are not to be cited as precedent.") (citing *State v. Oie*, 2007 MT 328, ¶ 16, 340 Mont. 205, 174 P.3d 937 ("[W]hen included in briefs, we give no regard to such citations.")); *State v. Little*, 260 Mont. 460, 468, 861 P.2d 154, 159 (1993) ("We do not recognize citations to unpublished opinions.")).

the husband dissolved his ranching operation and did not pay down operating expenses, but instead incurred more debt. *Marriage of Wagner*, 208 Mont. at 374, 679 P.2d at 755. After consideration of the unique circumstances presented by the case, we determined that:

> [N]either the husband's increased financial obligation, nor the wife's real estate and livestock purchases should legitimately be denominated "marital assets" for two reasons: (1) both were acquired after the marital relationship was irretrievably broken; (2) the disparity of the parties' business acumen resulted in a change of either's financial status after the separation so that selection of the later date would create an unjust distribution.

*Marriage of Wagner*, 208 Mont. at 379-80, 679 P.2d at 758.

¶55 In this case, although Mike received a substantial distribution from his employer after the parties separated, there was nothing unique about the circumstances surrounding his bonus payments, especially the LTIP bonus, which was based on metrics that Mike had been working toward for the previous three years. Additionally, the record includes testimony from Mike that he believed the equitable thing to do was to share his bonuses with Chelsey, as well as testimony from Chelsey that she and Mike had jointly decided to defer those anticipated funds for their family's benefit later on.

¶56 While it is true that Mike's incentive programs did not technically accrue until after the parties were separated, it is also undisputed that Mike was working toward the specific benchmarks rewarded by those incentive programs while the parties were still together, and at least the 2019 bonuses were paid out with certainty before the dissolution date. Including marital assets received post-separation but earned pre-separation does not require the court in this case to speculate about the increase in value because the growth at issue is not unknown future growth but the quantifiable difference between two past dates that can

23

be established by the account balances at each respective point in time. Because Chelsey is entitled to a portion of Mike's bonus accounts received post-separation, she is likewise entitled to the growth of her share of these assets throughout the pendency of the dissolution. *See In re Marriage of Krause*, 200 Mont. 368, 380-81, 654 P.2d 963, 969 (1982); *Rolfe II*, 234 Mont. at 298-99, 766 P.2d at 226 (reasoning that because the wife could easily earn over 3% were she able to invest the money immediately, "to value payments [as of the date of dissolution, yet suspend payment until the husband retires], without also demanding an immediate cash payment to wife, would result in an unfair windfall to husband").

¶57 The District Court erred by valuing Mike's retirement accounts as of the parties' separation because this date deprives Chelsey of a portion of her share of the assets.

### Tax Consequences

¶58 We have held that a district court abuses its discretion when it fails to consider concrete and immediate tax liability, particularly "when its property distribution order precipitates such tax liability." *In re Marriage of Thorner*, 2008 MT 270, ¶ 21, 345 Mont. 194, 190 P.3d 1063 (citing *In re Marriage of Haberkern*, 2004 MT 29, ¶ 17, 319 Mont. 393, 85 P.3d 743); *see also In re Marriage of Clark*, 2015 MT 263, ¶ 16, 381 Mont. 50, 357 P.3d 314 ("[W]here a property distribution ordered by a court includes a taxable event precipitating a concrete and immediate tax liability, such tax liability should be considered by the court before entering its final judgment.") (citing *In re Marriage of Beck*, 193 Mont. 166, 172, 631 P.2d 282, 285 (1981)).

¶59 Conversely, we have held that a district court does not abuse its discretion by failing to consider tax liabilities when those liabilities are *not* imminent taxable events. "Such consideration would cause the court to speculate as to the value of the specific marital asset." *Marriage of Haberkern*, ¶ 17 (citing *In re Marriage of Debuff*, 2002 MT 159, ¶¶ 48-50, 310 Mont. 382, 50 P.3d 1070; *In re Marriage of Taylor*, 257 Mont. 122, 127, 848 P.2d 478, 481 (1993); *In re Marriage of Swanson*, 220 Mont. 490, 496, 716 P.2d 219, 223 (1986); *In re Marriage of Gilbert*, 192 Mont. 444, 447, 628 P.2d 1088, 1089 (1981)).

¶60 Chelsey argues that the District Court improperly included future tax consequences in its valuation of Mike's deferred compensation plan, reducing the value of the parties' most significant asset, and because the District Court awarded the entire plan to Mike, this error resulted in an undervalued equalization payment to Chelsey. Mike argues that he will inevitably incur tax liabilities upon distribution of any funds eventually received from his deferred compensation plan, so awarding him this asset but failing to account for tax liability creates a windfall to Chelsey.

¶61 In *Marriage of Haberkern*, we squarely addressed the issue of "whether a district court abuses its discretion when it entertains a tax liability in valuing a marital asset where the distribution order does not specifically force a sale of the asset to satisfy the distribution nor is there an imminent sale of such asset." *Marriage of Haberkern*, ¶ 17. We reversed the district court's decision to deduct a twenty-two percent tax rate from the value of the husband's seven retirement accounts, which could not be liquidated without penalty for a minimum of three years, reasoning that "[t]o apply a deduction of a 'reasonable' tax rate to retirement accounts that may be liquidated at some time in the future frustrates the goal

25

of achieving a fair and equitable disposition of the marital estate." *Marriage of Haberkern*, ¶ 19. We concluded it was unreasonable to consider tax consequences "in light of numerous unknown factors such as the value of the account at the time it is eventually liquidated; the tax laws in effect at the time it is eventually liquidated; and when the account will eventually be sold. Otherwise, such valuations are merely conjectural." *Marriage of Haberkern*, ¶ 19. In this case, the District Court's distribution order does not trigger a taxable event as to Mike's deferred compensation plan, either directly or by circumstance. The District Court did not order the account to be liquidated and the record does not reflect that Mike's equalization payment to Chelsey compels the liquidation of any portion of the account.

¶62 Although the taxable event may be inevitable, it is neither concrete nor immediate. The taxable event is certainly not immediate because, similar to the situation in *Marriage of Haberkern*, Mike cannot withdraw funds from his deferred compensation plan until sometime in the future without incurring a penalty. The taxable event here is not concrete because of the "numerous unknown factors such as the value of the account at the time it is eventually liquidated; the tax laws in effect at the time it is eventually liquidated; and when the account will eventually be sold." *Marriage of Haberkern*, ¶ 19.

¶63 The District Court erred by discounting the value of Mike's deferred compensation plan by factoring in future tax consequences.

**George's Distributing**

¶64 Section 40-4-202, MCA, "obligates a court to equitably apportion between the parties all assets and property of either or both spouses, regardless of by whom and when

26

acquired." *Marriage of Funk*, ¶ 19; *see also In re Marriage of Richards*, 2014 MT 213, ¶ 33, 376 Mont. 188, 330 P.3d 1193. Specifically when distributing premarital property and property that is gifted or inherited, the court must also consider the contributions of the other spouse to the marriage, and take into account the following three factors as set forth in § 40-4-202(1), MCA: (a) the nonmonetary contribution of a homemaker; (b) the extent to which the contributions have facilitated the maintenance of the property; and (c) whether or not the property division serves as an alternative to maintenance arrangements. *Marriage of Funk*, ¶ 19. In *Marriage of Funk*, we explained:

> The court's decision must reflect that each of these factors was considered, but these considerations are not limitations on the court's obligation to equitably apportion all of the property, based upon the unique factors of each case. It will be incumbent upon the parties to provide full disclosure of all property. It will be incumbent upon the court to consider the assets and liabilities of each of the parties and to enter property-specific findings of fact underlying the apportionment, which findings are grounded in the language of § 40-4-202, MCA, and based upon substantial evidence.

*Marriage of Funk*, ¶ 34.

¶65    At trial, the parties disputed the value and valuation date of George's Distributing and argued over whether Chelsey's shares in the company should be considered a marital asset. The District Court determined that Chelsey's interest was a marital asset that should be awarded to Chelsey at Anderson's May 1, 2020 valuation of $2.56 million, with an offset for her premarital interest. The District Court reasoned that Mike's financial and non-financial contributions to the marital estate facilitated the appreciation of this asset by allowing Chelsey to defer income, raises, and bonuses, and to invest her time in growing the company. The District Court found that the parties' loan further comingled the asset,

"changing the characterization of what otherwise might be considered a gifted asset." The District Court also concluded that no maintenance was required in this case.

¶66 The District Court found Mike's testimony that he "contributed to George's Distributing, Inc. during the marriage by promoting the company with business and political associates, volunteering physical labor and at times providing advice relating to various business matters" credible. Beyond those activities, Mike's financial support of the marital estate enabled Chelsey to minimize her income, distributions, and bonuses from George's Distributing, allowing her to use funds that would have otherwise been part of the marital estate to contribute to the company's growth during the parties' marriage. The record reflects that during the parties' marriage from 2007 through 2019, George's Distributing more than doubled its annual gross sales. While Chelsey's compensation fluctuated from year to year, her pay did not remotely match the company's growth. The year of their separation in 2018, Chelsey, as company president, was the ninth-highest paid employee, excluding distributions, earning a base salary of $63,000 per year. Chelsey's 2018 base salary was more than $20,000 *less* than she was making in 2007 when she married Mike. Even after accounting for bonuses and distributions, Chelsey brought home $8,538 less from George's Distributing in 2018 ($112,683) than she did in 2007 ($121,388). While Chelsey testified, "there wasn't a lot of support for my family's business from Mike," conflicting evidence does not preclude a trial court's determination that substantial evidence exists to support a finding of fact. *In re A.K.*, 2015 MT 116, ¶ 31, 379 Mont. 41, 347 P.3d 711. The District Court's finding that Mike contributed to the maintenance of George's Distributing during the marriage is supported by substantial

28

credible evidence in the record and is not clearly erroneous. The court did not abuse its discretion when it included George's Distributing in the marital estate.

¶67 Chelsey also argues on appeal that Anderson's valuation was highly inflated as it failed to consider George's Distributing's unique geographic area and relatively high expenses compared to other distributorships, and was ultimately unfair to Chelsey because Anderson used a May 1, 2020 valuation date, while the District Court valued the parties' other assets as of the date of separation.

¶68 A district court "sits in the best position to judge the credibility of testimony and proffered evidence, and this Court defers to the district court's resolution of conflicting evidence." *In re Marriage of Frick*, 2011 MT 41, ¶ 23, 359 Mont. 296, 249 P.3d 67. We have recognized that "under [some] circumstances, selection of a single evaluation point for determining net worth of the parties could create an inequitable disposition." *In re Marriage of Walls*, 278 Mont. 413, 417, 925 P.2d 483, 485 (1996) (quoting *In re Marriage of Lippert*, 192 Mont. 222, 226-27, 627 P.2d 1206, 1208 (1981) ("[D]iscretion by the District Court is necessary when determining the worth of marital assets which fluctuate in value. For example, the value of a particular common stock may change drastically during the course of a dissolution while the value of the family home or other personal property remains stable."). Valuing different assets at different times is not an abuse of discretion so long as "the findings as a whole are sufficient to determine the net worth and to decide whether the distribution is equitable." *Marriage of Walls*, 278 Mont. at 417, 925 P.2d at 485 (internal quotations and citations omitted); *see also In re Marriage of Milesnick*, 235 Mont. 88, 96, 765 P.2d 751, 756 (1988) ("If a single valuation

29

date would lead to an inequitable distribution of property, the District Court may choose several different times for valuation.").

¶69 The District Court had credible expert testimony to support its valuation for George's Distributing. The District Court found that both Mike's expert, Anderson, and Chelsey's expert, Copley, were qualified to provide a valuation for the court, but that Anderson and his staff have "extensive knowledge of the alcohol beverages industry, geographic analysis of market areas, financial analysis, damages and valuation models" and "determining the value of George's and Chelsey's ownership interest therein falls squarely within Anderson's typical scope of work and expertise." Conversely, the District Court determined that "Copley's experience is limited to valuing 'three or four' local distributorships in the past." The court provided detailed findings summarizing the extensive testimony from both experts as to their complex methods and analyses.

¶70 At trial, Anderson testified that there would be no real difference between his valuation date of May 1, 2020, and Copley's valuation date of December 31, 2019. Anderson further testified that his calculations included the effects of the COVID-19 pandemic, stating, "[W]e took a one-time adjustment as probably an overly-conservative adjustment. But that I think fulsomely takes into account anything that's happening to the value of this business this year." Copley's calculations did not.

¶71 Substantial credible evidence supported the District Court's decision to adopt Anderson's valuation of George's Distributing as of May 1, 2020. Notably, neither party submitted a valuation for George's Distributing as of November 1, 2018, and we have repeatedly stated that it is "the parties' responsibility to provide the District Court with

30

competent evidence regarding property values." *Marriage of Hutchins*, ¶ 52 (citing *Marriage of Funk*, ¶ 7). On the record before it, the District Court provided a thorough analysis of both experts' qualifications and thoroughly supported its decision to adopt Anderson's valuation. We decline to disturb the District Court's valuation of this asset on appeal.[6]

**Statutory Factors**

¶72 In making its apportionment, a district court must consider the statutory factors listed in § 40-4-202, MCA. *Marriage of Hutchins*, ¶ 7. The factors include the duration of the marriage and prior marriage of either party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties, custodial provisions, whether the apportionment is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition of capital assets and income. Section 40-4-202(1), MCA. The court must also consider "the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit." Section 40-4-202(1), MCA. The factors listed in § 40-4-202(1), MCA, must be considered and referenced in the court's findings and conclusions, and there must be competent evidence presented on the values of the property. *In re Marriage of Collett*, 190 Mont. 500, 504, 621 P.2d 1093, 1095 (1981).

---

[6] Because we hold the District Court erred in utilizing a valuation date of November 2018 for the parties' other significant assets, we need not address Chelsey's contention that the court's May 1, 2020 valuation date for George's Distributing was unfair by comparison since all assets are being valued as of the date of dissolution, which was only eight weeks after Anderson's valuation date and took "into account anything that's happening to the value of [George's Distributing] this year."

Although district courts are encouraged to make specific findings on each factor listed in § 40-4-202(1), MCA, the factors "are not limitations on the court's obligation and authority to equitably apportion all assets and property of either or both spouses, based upon the unique factors of each case." *Marriage of Funk*, ¶¶ 19, 25.

¶73 Mike maintains the court properly considered all factors. Chelsey argues that the District Court failed to consider the statutory factors in § 40-4-202(1), MCA, when distributing the marital estate, particularly Mike's ability to acquire capital. Chelsey contends that, because the evidence establishes Mike's average earnings from 2017-19 are 22 times Chelsey's average earnings, "the court's 50-50 allocation of a skewed marital estate shows it failed to consider this statutory criteria." Chelsey explains:

> Copley provided testimony as to each party's opportunity to acquire capital. Copley opined that if Chelsey received 50% of the HCSC deferred compensation plan through 2020, that plan would grow to a value of $10,600,000 by August 30, 2030. If Mike received 50% of the HCSC deferred compensation, he would have deferred compensation estimated at $37,000,000 by the same date. Chelsey was awarded 0% of the HCSC deferred compensation. As such, Mike's value in his HCSC plan will exceed $46,000,000 and Chelsey will have none. The testimony was undisputed. The court, by ignoring this statutory factor, exacerbated its error.

¶74 The District Court's Findings of Fact, Conclusions of Law and Order contains detailed findings regarding the parties' current and future earnings potential and liabilities. For example, Finding No. 133 provides:

> This division of property takes into consideration the property each party contributed to the marital estate, each party's financial and nonfinancial maintenance of the marital estate, the fact that Chelsey is almost 10 years younger than Mike, and the fact that both parties have the ability to acquire significant assets in the future. This division also leaves Chelsey's business interests intact and allows her to proceed debt free.

32

¶75    Chelsey's argument on this issue is unsupported by the record.  The District Court's property allocation, with which Chelsey takes issue, does not show that the court failed to consider the statutory factors.  Faced with an extensive and complicated estate, the District Court considered each party's arguments and made findings and conclusions as to an equitable distribution.  *Marriage of Collett*, 190 Mont. at 504, 621 P.2d at 1095.  While we have concluded the District Court erred in several of its determinations, the District Court nevertheless considered the statutory factors when apportioning the marital estate.

**Division of Property Conclusion**

¶76    The District Court abused its discretion by valuing the marital estate as of the date of the parties' separation.  The District Court erred by discounting the value of Mike's deferred compensation plan by factoring in future tax consequences that were neither imminent nor concrete.  The District Court did not abuse its discretion when it included George's Distributing in the marital estate and substantial credible evidence supported the court's decision to adopt Anderson's valuation of George's Distributing as of May 1, 2020.  The District Court properly considered the statutory factors in § 40-4-202, MCA.

*2.  Whether the District Court abused its discretion in calculating child support.*

¶77    Montana's child support guidelines promote the principle that "parents have the first priority to meet the needs of their children according to their financial ability."  *Marriage of Williams*, ¶ 23 (citing Admin. R. M. 37.62.101(2)).  "In a dissolution of marriage, a child's standard of living should not, to the degree possible, be adversely affected because a child's parents are not living in the same household."  Admin. R. M. 37.62.101(2).  The guidelines create a rebuttable presumption that require the court to consider each case "on

its own merits and circumstances," and support its decision to deviate from the guidelines after considering evidence that "a child's needs either are, or are not, being met." Admin. R. M. 37.62.102(1); § 40-4-204, MCA. To deviate from the guidelines, the district court must find by "clear and convincing evidence that application of the guidelines would be unjust or inappropriate." *In re Marriage of Albinger*, 2002 MT 104, ¶ 12, 309 Mont. 437, 47 P.3d 820 (citing § 40-4-204(3)(a), MCA). If the court finds the guideline amount is unjust or inappropriate in a particular case, it must state its reasons for that finding. Section 40-4-204(3)(b), MCA.

¶78 The guidelines define income as "actual income, imputed income, or any combination thereof which fairly reflects a parent's resources available for child support." Admin. R. M. 37.62.105(1). "Actual income" is further defined to include: "economic benefit from whatever source derived . . . [including] but not limited to income from salaries, wages, tips, commissions, bonuses, earnings, profits, dividends, severance pay, pensions, periodic distributions from retirement plans . . . ." Admin. R. M. 37.62.105(2)(a). "Imputed income" means income not actually earned by a parent, but which is attributed to the parent. Admin. R. M. 37.62.106(1). It is appropriate to impute income to a parent when the parent is underemployed. Admin. R. M. 37.62.106(2). When determining income under the guidelines, the court must consider the disposable income of the parent, not their income tax returns alone. *In re Marriage of Gray*, 242 Mont. 69, 73, 788 P.2d 909, 912 (1990). A parent receives credit for supplemental needs paid by that parent. Admin. R. M. 37.62.123(3). Supplemental needs include the reasonable cost of

health insurance coverage, unreimbursed health care expenses, and other needs of the child as determined by the circumstances of the case. Admin. R. M. 37.62.123(1).

¶79 On appeal, Chelsey seeks child support in the amount of $9,471 per month, which she argues is in line with the guidelines and takes into account Mike's approximately $2.5 million in annual income that the District Court ignored. Chelsey claims that following the guidelines would provide her with "adequate resources to maintain the lifestyle she and Mike provided to E.F. while they were married" and allow E.F. to have a consistent standard of living when he is with both parents. Mike argues the District Court's child support payment is appropriate given the parties' pattern of living on base salaries and Mike's obligation to pay 100% of E.F.'s insurance premiums and uncovered medical expenses.

¶80 The District Court's findings and conclusions adequately support its decision to deviate from the guidelines. The District Court found that "[o]n its face, [Chelsey's] budget is not consistent with the parties' marital spending or lifestyle." The court concluded that "[g]iven the uncertainty of Chelsey's bonuses, the fact that she is undercompensated and the inability to quantify with precision her other non-cash employment benefits, it is appropriate to use Chelsey and Mike's base incomes to calculate Child Support." Recognizing that the statutory definition of "actual income" is broad and "may include Mike's various bonuses," the District Court nonetheless concluded "it would be unjust and inequitable to include bonuses which Mike is not guaranteed to Mike's income." The District Court supported this conclusion with the example of Mike's HCSC Master Deferred Compensation Plan, which the court found reflects an unsecured promise

to pay with no guarantee that Mike will not lose the entire balance if his employer goes bankrupt.

¶81   Additionally, the District Court considered: (1) the undisputed testimony that the family lived, for the most part, on the parties' base salaries during the marriage; (2) Chelsey's imputed income, which the court found to be $220,000 per year; (3) Mike's 50/50 parenting time and obligations in the parenting plan to continue to pay for E.F.'s medical, ocular, dental and orthodontia, and other agreed child-related expenses; (4) E.F.'s 11% interest in George's Distributing; and (5) the fact that E.F.'s needs are "generously" provided for in both homes.  The District Court determined that the presumption created by the guidelines was rebutted in this case by evidence that the child's needs have been and will continue to be met despite the variance, and that following the guidelines would be unjust to Mike and result in a windfall to Chelsey.

¶82   The District Court's factual findings regarding child support are sufficiently supported by the record and the court did not abuse its discretion in deviating from the guidelines.

   3.   *Whether the District Court's adoption of Mike's proposed Findings of Fact, Conclusions of Law warrants a new trial.*

¶83   Section 25-11-103, MCA, limits the remedy of a new trial for cases tried by the court without a jury, except in the case of an irregularity in the proceedings or an abuse of discretion by which either party was prevented from having a fair trial; an accident or surprise that ordinary prudence could not have guarded against; or newly discovered

material evidence. *Adams v. Dep't of Highways*, 230 Mont. 393, 398, 753 P.2d 846, 849 (1988).

¶84     While we discourage district courts from adopting a party's proposed findings and conclusions verbatim, "such an action is not *per se* error." *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶ 29, 330 Mont. 282, 127 P.3d 436. This Court has approved the verbatim adoption of findings and conclusions where they are comprehensive and detailed and supported by the evidence. *Wolfe v. Webb*, 251 Mont. 217, 229, 824 P.2d 240, 241 (1992) (citing *Pipinich v. Battershell*, 232 Mont. 507, 510, 759 P.2d 148, 150 (1988)). To determine if a district court's use of proposed findings of fact and conclusions of law was proper, we ask whether the proposed findings "are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence presented." *In re Marriage of Benner*, 219 Mont. 188, 193, 711 P.2d 802, 805 (1985) (citing *In re Marriage of Jensen*, 193 Mont. 247, 253, 631 P.2d 700, 703 (1981)).

¶85     Chelsey argues that the District Court's near verbatim adoption of Mike's proposed findings and conclusions should render its order reversible as evidence that the court failed to exercise its independent judgment. Mike asserts that Chelsey fails to identify specific findings that are allegedly unsupported, and the notion that the District Court blindly adopted Mike's proposed findings is refuted by the extensive record. Mike maintains that Chelsey is not entitled to a new trial because she neither requested a new trial nor does she have grounds for one.

¶86     The District Court's adoption of Mike's proposed findings and conclusions is not per se error. Nevertheless, "[i]f inadequate findings result from improper reliance upon

37

drafts prepared by counsel—or from any other cause—it is the result and not the source that is objectionable." *Marriage of Jensen*, 193 Mont. at 252, 631 P.3d at 703. As discussed in detail above, irrespective of the source, we have found some of the District Court's resulting findings and conclusions to be in error.

¶87 The record is sufficiently comprehensive to provide a basis for the District Court's reconsideration on remand. Chelsey's basis for requesting a new trial is entirely due to the trial court's adoption of Mike's proposed findings and conclusions nearly verbatim. Chelsey points to nothing in the record that allegedly prevented her from having a fair trial, notwithstanding the court's errors, which can be corrected on remand without a new trial. Dissolution proceedings originated in January 2019 and the trial itself spanned three days in June 2020. Six witnesses testified, including three experts, and 260 exhibits were admitted into the record. The trial transcript contains over 800 pages of testimony. There were no irregularities in the proceedings, and Chelsey has not asserted any accident, surprise, or newly discovered material evidence justifying a new trial under § 25-11-103, MCA. The District Court is "in the best position to reconsider the evidence . . . and reapportion the estate on the existing record" consistent with this Opinion. *Marriage of Williams*, ¶ 15.

## CONCLUSION

¶88 The marital estate includes Chelsey's interests in George's Distributing and Mike's retirement earnings, including the gross value of his deferred compensation plan, up to the date of the parties' dissolution. The District Court did not abuse its discretion in calculating child support. Although the District Court committed some errors as discussed above,

Chelsey has not demonstrated that the errors were due to the District Court's adoption of Mike's proposed Findings of Fact, Conclusions of Law such that they require a new trial.

¶89    Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.


/S/ JAMES JEREMIAH SHEA


We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE


Justice Dirk Sandefur has recused himself and did not participate in the decision of this case.